**Kenneth ADAMS, et al., Plaintiffs,**

v.

**William BENNETT, Secretary of Education, et al., Defendants.**

**WOMEN'S EQUITY ACTION LEAGUE, et al., Plaintiffs,**

v.

**William BENNETT, Secretary of Education, et al., Defendants.**

**Civ. A. Nos. 3095–70, 74–1720.**

United States District Court, District of Columbia.

Dec. 11, 1987.

---

David J. Anderson, Richard A. Levie, Felix V. Baxter, Sharon L. Reich, Washington, D.C., for defendants.

Julius LeVonne Chambers, James M. Nabrit, III, Theodore M. Shaw, New York City, Joseph L. Rauh, Jr., Elliott C. Lichtman, Mary M. Levy, James C. Turner, Washington, D.C., for plaintiffs.

Marcia Greenberger, Washington, D.C., for plaintiffs in WEAL and plaintiff-intervenors in Adams.

Cole Hicks, Matthew L. Jacobs, Washington, D.C., for plaintiff-intervenor National Foundation of the Blind.

Norma V. Cantu, Ronald T. Vera, Al Kauffman, Jose Garza, San Francisco, Cal., Hadrian R. Katz, Stuart Land, Washington, D.C., for plaintiff-intervenor Mexican Americans.

## MEMORANDUM OPINION AND ORDER

JOHN H. PRATT, District Judge.

On September 14, 1984, the United States Court of Appeals for the District of Columbia remanded this matter for a "current ruling on whether standing and other Article III requirements are satisfied." *Women's Equity Action League (WEAL) v. Bell*, 743 F.2d 42, 44 (D.C.Cir.1984). The Court of Appeals had before it two matters: (1) defendants' appeal from a March 11, 1983 order of this court denying their motion to vacate a 1977 Consent Decree containing time frames for the processing of complaints and compliance reviews by the Department of Education's Office of Civil Rights (OCR), and (2) defendants' appeal from a second order of this court dated March 24, 1983, granting injunctive relief which reimposed, also with some modifications, the time frames and associated provisions relating to higher education which had also been part of the 1977 Consent Decree. The appeals raised important questions regarding whether the 1977 and 1983 time frame decrees were authorized by the applicable statutes and Executive Orders, whether the decrees, involving judicial intervention in the day-to-day operations of agencies of the Executive Branch, violated the separation of powers doctrine and whether the decrees, under traditional equity concepts, were any longer necessary or appropriate.

The Court of Appeals did not reach the merits of these contentions. Rather, in view of defendants' basic argument that this court had "lost sight of the specific goals of the initial suit", and embarked on a policy of supervising Executive Branch activity for an indefinite period of time, the Court of Appeals found itself "obliged to consider on [its] own motion threshold Article III impediments to the initiation and maintenance of [this] action." *WEAL*, 743 F.2d at 43. The two specific Article III concerns raised by the Court of Appeals involved questions of standing and mootness. The Court expressed no opinion on these threshold issues or on the merits of defendants' underlying complaint concerning the legality of the two decrees. Accordingly, it vacated the orders from which appeal had been taken and remanded the case to this court "for consideration whether, in harmony with the case-or-controversy limitations ... this action may proceed in court". *Id.* at 44. In taking this action, the Court of Appeals placed great reliance on the decision of the Supreme Court in *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), handed down during the pendency of the appeal. In *Allen*, the Supreme Court raised the question whether "absent actual present or immediately threatened injury resulting from unlawful government action," it is an appropriate role for federal courts to act as "virtually continuing monitors of the wisdom and soundness of Executive action". *Id.* at 760, 104 S.Ct. at 3329 (quoting *Laird v. Tatum*, 408 U.S. 1, 15, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972)). This is a question to which we will return after a brief detour.

### I. *Background*

It is appropriate at this point, before we begin our consideration of the Article III concerns raised by the Court of Appeals, to set forth briefly the relevant history of this case. This litigation has its roots in the

distant past. Several actions have been joined to give it its present shape and form.[1] The common thread underlying each of the several complaints in this litigation, however, is the alleged improper grant of federal funds in violation of various statutes and regulations. These statutes and regulations include Title VI of the Civil Rights Act of 1964, (Title VI), 42 U.S.C. § 2000d *et seq.* (1982), Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq.* (1982), Executive Order No. 11246, as amended by Executive Order 11375, and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1982). Plaintiffs also present a constitutional challenge to defendants' conduct.

The original *Adams* case presented a challenge to HEW's policy of non-enforcement of Title VI with regard to claims of racial discrimination. In 1976 additional groups and individuals were allowed to intervene in the *Adams* litigation on the basis of HEW's representation that the Title VI enforcement obligations previously imposed by this court made it impossible to devote sufficient resources to the review and processing of Title IX sex discrimination and Title VI national origin discrimination complaints. In October 1977, the National Federation of the Blind also intervened, complaining of lack of enforcement

of § 504 of the Rehabilitation Act of 1973 and § 904 of the Education Amendment Act of 1972 with respect to discrimination based on handicap. Thus, the entry of these plaintiff-intervenors in the *Adams* suit greatly expanded the statutory scope of the litigation.

As an indication of the breadth of this extensive and protracted litigation, it is significant to note that the current *Adams* plaintiffs consist of forty (40) individuals, eight (8) individual plaintiff-intervenors[2] and five (5) plaintiff-intervenor organizations.[3] The current *WEAL* plaintiffs consist of two (2) individuals and six (6) organizations.[4] Defendants' Memorandum in Support of their Motion to Dismiss (Defs. Memo.) at 5.

### A. Court of Appeals Pronouncements

In the original *Adams* case filed in 1970, we held that the Department of Health, Education and Welfare and its Director of the Office of Civil Rights did not have further discretion but were under an affirmative duty to commence enforcement proceedings against public educational institutions to ensure compliance with Title VI where efforts towards voluntary compliance were not attempted or successful. *Adams v. Richardson,* 351 F.Supp. 636, 641 (D.D.C.1972). Subsequently, we ordered the agency to take certain corrective

1. The original *Adams* litigation presented a challenge to the Department of Health, Education & Welfare's policy of nonenforcement of Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d *et seq.* (1982), with respect to seventeen (17) southern and border states. In 1975 a similar suit was filed against HEW alleging that the agency was failing to enforce Title VI in thirty three (33) northern and western states as well. Judge Sirica found HEW in default of its statutory obligations. *Brown v. Weinberger,* 417 F.Supp. 1215 (D.D.C.1976). Relief in that case was for the most part consolidated with *Adams* in the December 29, 1977 order. The 1977 Consent Decree also expanded the scope of the litigation by including a separate suit brought by the Women's Equity Action League in 1974. In that complaint, WEAL alleged that the Department of Health, Education & Welfare (HEW) and the Department of Labor (DOL) had both failed to meet their obligation to enforce Executive Order 11246 with respect to institutions of higher education, and that HEW had failed to comply with its Title IX obligations.

2. Plaintiff-intervenors *Martinez, et al.* are four individuals: Jimmy Martinez, Ben G. Salazar, Pablo E. Ortega and Arturo Gomez, Jr. Plaintiff-intervenors *Cynthia L. Buxton, et al.* are two individuals: Cynthia L. Buxton and Kay Paul Whyburn. Finally, individual handicapped plaintiff-intervenors are Douglas J. Usiak and Joyce F. Stiff.

3. These organizations include the Women's Equity Action League (WEAL), the National Organization for Women (NOW), the National Education Association (NEA), the Federation of Organizations for Professional Women (FOPW) and the National Federation for the Blind (NFB).

4. These organizations include WEAL, NOW, NEA, FOPW, the Association for Women in Science (AWIS), and the United States Student Association (USSA). Unless otherwise indicated, both the plaintiffs and plaintiff-intervenors in *Adams* and the plaintiffs in *WEAL* will be collectively referred to as "plaintiffs."

measures. *Adams v. Richardson,* 356 F.Supp. 92 (D.D.C.1973). With minor modifications not here relevant the Court of Appeals, sitting *en banc,* affirmed this court's decision. *Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir.1973) [hereinafter *"Adams I"*]. Although our order directed that the commencement of enforcement proceedings take place within certain time frames, the appellate court was careful to emphasize that:

> the order merely requires *initiation of a process* which, excepting contemptuous conduct, will then pass *beyond the District Court's continuing control and supervision.*

*Id.* at 1163 n. 5. (Emphasis added).

A further interpretation of the boundaries of our 1973 order arose later in another context. In March, 1979, the Department of Education (DE), which had succeeded to HEW's jurisdiction, rejected the State of North Carolina's desegregation plans, and subsequently commenced enforcement proceedings against the State.[5] In response, North Carolina filed suit in federal court in North Carolina to enjoin the administrative hearing and to prevent the DE from deferring grant payments. The North Carolina court enjoined the deferral of payments but permitted the enforcement proceeding to continue. After the Department had completed the presentation of its case in chief, after several months of hearings, the parties entered into a consent settlement, which the North Carolina court approved. *North Carolina v. Department of Education,* Memo.Op., No. 79–217–CIV–5 (E.D.N.C. July 17, 1981). At this juncture, the *Adams* plaintiffs, who were not parties to the North Carolina suit, sought injunctive relief from this court to enjoin the Department from acceding to the proposed consent settlement. We declined to grant the requested relief, for reasons of comity as well as limitations in the scope of our original 1973 order. *Adams v. Bell,* Transcript at 26–30, No. 70–3095 (D.D.C. June 25, 1981). The Court of Appeals for this Circuit, again sitting *en banc,* affirmed our decision. *Adams v. Bell,* 711 F.2d 161 (D.C.Cir.1983) [hereinafter *"Adams II"*]. It found that the purpose of the 1973 decree was to require the Department to meet its responsibilities under Title VI by the commencement of formal proceedings or through voluntary compliance, and that our decree did not extend to details of particular enforcement programs, including the supervision of the Department's settlement with North Carolina.[6] *Id.* at 165.

The opinions of the appellate court in *Adams I* and *Adams II* are the only Court of Appeals decisions concerning the proper reach and meaning of our original order. They both affirm the original direction of this litigation, and emphasize the limited nature of our intervention.

We turn now to the events leading up to the 1977 Consent Decree, the validity of which was indirectly challenged in the appeal in *WEAL, supra.*

### B. *The 1977 Consent Decree*

In 1975, in response to plaintiffs' suit alleging delays in the administrative processing of complaints in elementary and secondary education cases, we ordered the agency to proceed against defaulting school districts and imposed time frames controlling future enforcement activities by the agency. *Adams v. Weinberger,* 391 F.Supp. 269 (D.D.C.1975). This consent order was negotiated by the parties and served to supplement our original February 16, 1973 order. It came to be known as the First Supplemental Order, and was the

---

**5.** These proceedings were commenced as the result of an order we issued on April 1, 1977 in *Adams v. Califano,* 430 F.Supp. 118 (D.D.C. 1977). This order, denominated the Second Supplemental Order, directed defendant to notify six southern states, including North Carolina, that their plans for higher education were not adequate. The Second Supplemental Order set time frames for the submission of final guidelines and revised desegregation plans by each state, and for the acceptance or rejection of such plans by defendants.

**6.** The Court of Appeals expressly stated that it did not "pass on the scope of the District Court's authority with reference to other possible Department of Education actions...." *Adams II,* 711 F.2d at 165. This exclusion covers the content of our subsequent orders of March 11, 1983 and March 24, 1983, which are the focus of the present litigation. *Id.* at 165 n. 25.

first of a series of orders [7] establishing time frames for each stage of the administrative process. Part F of this order directed attention for the first time to future Title VI enforcement activities, setting time limitations for the handling of future complaints and compliance reviews. *Id.* at 273. Part F of the First Supplemental Order was modified by an unpublished June 14, 1976 order of this court which established separate guidelines for the administrative processing of Title VI and Title IX complaints, compliance reviews, and Emergency School Aid Act cases. *Adams v. Matthews,* No. 3095–70 (D.D.C. June 14, 1976). A so-called Second Supplemental Order concerning the acceptable ingredients for the desegregation of higher education in the states was issued on April 1, 1977. *Adams v. Califano,* 430 F.Supp. 118 (D.D. C.1977).

In mid–1977, the *Adams* plaintiffs were again before this court seeking further relief for noncompliance with the 1975 order referred to above and with that portion of the 1973 order relating to special purpose and vocational schools. Plaintiffs sought compliance with previously imposed time frames and other administrative requirements. The court, after an extensive hearing, directed the parties to enter into negotiations. These negotiations resulted some months later in the 1977 Consent Decree issued on December 29, 1977. *Adams v. Califano,* No. 3095–70 (D.D.C. December 29, 1977).

The 1977 Decree was more extensive than the orders entered previously and differed from them in several respects. First, the Decree broadened the court's review of HEW enforcement activities to include all fifty states.[8] Second, in addition to Title VI, it applied to complaints and compliance reviews under Title IX, Executive Order No. 11246,[9] and § 504 of the Rehabilitation Act of 1973.[10] Third, it set forth a number of additional procedural steps to be performed following receipt of a completed complaint. *Id.* at ¶¶ 8(a), 9 and 11.

It is a fair summary to state that the emphasis in the original order of 1973 stemmed from defendants' abdication of their statutory responsibility in pursuing a conscious policy of non-enforcement. The 1973 order, as stated previously, rejected the agency claim that it had almost unfettered discretion in this area, and, instead, directed that enforcement proceedings be commenced within certain limited time frames. These time frames have become more detailed with the issuance of each new order, in part because of defendants' chronic delays and in part because of the asserted necessity for these delays during the various stages of the administrative proceedings. The Consent Decree of December 29, 1977 was a culmination of this process and attempted to address these difficulties in a single document fifty-four (54) pages in length comprised of eighty-eight (88) separately numbered paragraphs. Limitations of space prevent a detailed catalogue of these provisions. It is sufficient to say that the parties, in good faith, made a serious attempt to settle all outstanding differences existing between them.

In August 1982 defendants moved to vacate the 1977 Consent Order asserting changes in fact and law, as well as the need for a deeper consideration of the facts in light of experience. We denied defendants' motion to vacate on March 11, 1983.

---

7. A partial list of the relevant decisions and orders is attached hereto.

8. As noted previously, the expanded geographical scope of the litigation resulted from the consolidation of this action with *Brown v. Weinberger,* 417 F.Supp. 1215 (D.D.C.1976), a case involving similar complaints against defendants with regard to 33 northern and western states.

9. Prior to the date of the December 1977 Decree, HEW had responsibility under the Office of Federal Contract Compliance Programs (OFCCP) for the enforcement of Executive Or-

der No. 11246, including sex based claims of employment discrimination in institutions of higher education with substantial government contracts. Ten months after the December 1977 Decree, OFCCP assumed this responsibility.

10. The Decree also expanded the scope of the 1970 litigation, as noted earlier, by linking a separate suit brought by *WEAL* against HEW and the DOL. All parties agreed that the December 29, 1977 Consent Decree would apply to the *WEAL* action as well.

On the same day, in response to Motions for Orders to Show Cause filed by the *Adams* and *WEAL* plaintiffs, we entered a detailed order of thirty-seven (37) pages modifying the 1977 Consent Order as it applied to the DE and the DOL. On March 24, 1983, in response to Plaintiffs' Renewed Motion for Further Relief Concerning State Systems of Higher Education, we entered a separate order, in which we found that five southern states [11] had defaulted in their commitments under previously accepted desegregation plans in violation of Title VI. *Adams v. Bell*, No. 3095–70 (D.D.C. March 24, 1983). We ordered defendants to require these states, with the exception of Virginia, which had recently submitted a provisionally approved plan, to submit further plans within a limited time frame or to commence formal enforcement proceedings no later than September 15, 1983. *Id.* Injunctive relief was also granted requiring defendants to take similar action with respect to Pennsylvania and Kentucky, and was denied with respect to Texas, West Virginia, Missouri and Delaware. *Id.*

Defendants appealed from this court's denial of their motion to vacate the 1977 Consent Decree and from the March 24, 1983 order relating to statewide systems of higher education. It is this appeal which is the subject of the Court of Appeals remand of September 14, 1984. *WEAL, supra.*

## II. *Discussion*

Because the remand raised issues of standing and mootness, defendants were given an opportunity to engage in and complete discovery on these issues.[12] After extensive discovery, defendants filed a Motion to Dismiss on the grounds that (1) plaintiffs lack standing; (2) the doctrine of separation of powers defeats standing as a matter of law and (3) the claims of the plaintiffs in *WEAL* and the plaintiff-intervenors in the *Adams* litigation are moot. The *Adams* plaintiffs, in opposition to defendants' Motion to Dismiss, assert (1) that plaintiffs are suffering concrete personal injuries; (2) that these injuries are fairly traceable to defendants' conduct and (3) that such injuries are likely to be redressed by a decree of this court. After distinguishing *Allen v. Wright, supra,* they contend that defendants' separation of powers argument is lacking in substance. They point to the necessity of time frames to meet defendants' chronic delays in the enforcement of defendants' obligations under Title VI and other statutes and the fact that the time frames were consented to by the appropriate officials of two different political administrations. Oppositions to defendants' Motion to Dismiss have been filed on behalf of WEAL,[13] as well as other *Adams* intervenors.[14]

### A. *Standing*

Federal courts, as has long been recognized, are courts of limited jurisdiction. This jurisdiction, under Article III, Section 2 of the Constitution, is limited to the adjudication of "cases" and "controversies." A plaintiff must first meet the requirements of standing before seeking to invoke the authority of a federal court to decide the merits. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975). As the result of numerous cases arising in varying factual contexts, it is

---

**11.** These states include Florida, Georgia, Oklahoma, Virginia and North Carolina. The order applied to North Carolina's community colleges only.

**12.** On May 9, 1984, while this action was pending on appeal, we permitted plaintiffs to add new plaintiffs and certified the action as a class consisting of the newly added plaintiffs and certain others. Our January 17, 1985 order confined discovery to the issue of standing "without relitigating the certification order of May 9, 1984."

**13.** As noted previously, WEAL filed its complaint in 1974 based upon defendants' alleged violations of Title IX and Executive Order No. 11246. This *Weal* complaint has been processed with the original *Adams* Title VI litigation since the issuance the 1977 consent decree.

**14.** Oppositions were filed on behalf of the Mexican–American plaintiff-intervenors, plaintiff-intervenor National Federation of the Blind, and others. These interventions are predicated on alleged violations of statutes other than Title VI. Since the issues raised by defendants' Motion to Dismiss are equally applicable to all intervenors, the oppositions of the above indicated parties will not be separately treated.

well settled that the doctrine of standing encompasses both a prudential component and a core component stemming directly from Article III and resting ultimately on the concept of separation of powers. Standing and the overlapping mootness, ripeness and political question doctrines concern "the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government". *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1179 (D.C.Cir.1983) (Bork, J., Concurring).

At an "irreducible minimum," the constitutional component embodied in Article III requires that a plaintiff show: (1) that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant; (2) that the injury is fairly traceable to the challenged action and; (3) that the injury will likely be redressed by the relief requested. *Allen v. Wright,* 468 U.S. at 751, 104 S.Ct. at 3324. *See also Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 759, 70 L.Ed.2d 700 (1982).

Admittedly the constitutional component of the standing doctrine involves concepts not susceptible of precise definition, but ideas as to standing have gained considerable definition from developing case law and have evolved as guiding principles. As the cases show, the plaintiff must show injury in fact, which is "distinct and palpable." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (quoting *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206). The injury cannot be "abstract" or "speculative." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1164–65, 75 L.Ed.2d 675 (1983). It must be "fairly" traceable to the action challenged, and likely to be redressed by a favorable decision. *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450. The Supreme Court has taken note of this case-by-case development:

[T]he law of Article III standing is built on a single basic idea—the idea of separation of powers. It is this fact which makes possible the gradual clarification of the law through judicial application. *Allen,* 468 U.S. at 752, 104 S.Ct. at 3325.

The prudential component of the standing doctrine likewise embodies concepts which cannot be precisely defined. They also are based on the idea of separation of powers and are "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth,* 422 U.S. at 498, 95 S.Ct. at 2205. These are the standards applicable to our determination of the issue of plaintiffs' standing to pursue this litigation.

### 1. *Injury*

■ Plaintiffs' basic contention is that defendants have granted and are continuing to grant federal assistance to educational institutions and political entities in violation of the rights of the plaintiffs under various statutes and under the Fifth Amendment of the Constitution. They assert that this is an injury separate and apart from the harm inflicted by the educational institutions in which they are enrolled, or by the states in which they reside.

The individual *Adams* plaintiffs, some 40 in all [15] reside in various states and attend a variety of state educational institutions. Many of the plaintiffs can be placed in one of the following categories. (1) Three are students at Virginia State University (VSU), a predominantly black institution. They complain of unequal and inadequate facilities, equipment and programs. VSU is not in accord with the time frames set in our March 11, 1983 order. (2) Four of the plaintiffs are students at the University of Arkansas at Fayetteville (UAF), a traditionally white institution. According to the July 8, 1985 findings by OCR, UAF had failed to reach its black student, faculty and administrator goals for 1984–85, as required by its statewide desegregation plan.[16] Defendants have not denied this

---

**15.** *See* Stipulation of May 28, 1985.

**16.** Arkansas' performance has not improved. *See* House Committee on Government Opera-

allegation. (3) Three of the plaintiffs are students in Dillon County, South Carolina School District No. 2 (Dillon), who are enrolled in segregated classrooms. Since 1977, Dillon has been found by OCR to be in violation of Title VI on three different occasions. The matter was referred to the Department of Justice on June 23, 1983, following our order of March 11, 1983. Almost one year later it was returned by the Department of Justice to OCR, where it is still "under review." These facts are not challenged. (4) Five of the plaintiffs are students in Halifax County, Virginia, alleging racially discriminatory action in connection with events which occurred on a County school bus. OCR investigated the report and issued a letter of finding that Halifax County had not violated Title VI.

The *Adams* plaintiffs also assert standing on behalf of unnamed members of the class certified under our May 7, 1984 order. In response, defendants have submitted a case-by-case analysis of the status of the individual plaintiffs. Defs.Memo., Ex. A. They assert that:

> defendants' recent discovery efforts reveal that most of the current plaintiffs have not filed complaints with the Department of Education or the Department of Labor, or have complaints that are tolled pending resolution of private litigation, or do not attend schools currently undergoing compliance reviews. In these instances, neither agency action in general nor the timeframes in particular have been triggered.

*Id.* at 2.

Without attempting to challenge the accuracy of the above assertion, we are satisfied that one or more of the plaintiffs, in charging racial discrimination against themselves, have alleged a distinct and palpable personal injury in violation of their rights under Title VI and the Constitution. This is more than a case where plaintiffs are asserting the right to have the government act in accordance with the law or the right to a particular kind of government conduct. This is also not an abstract or generalized grievance. Rather, the injury claimed in the instant case is the right to be educated in a racially integrated institution or in an environment which is free from discrimination based on race. As was said in *Allen:*

> It is in their complaint's second claim of injury that respondents allege harm to a concrete, personal interest that can support standing in some circumstances. The injury they identify—their children's diminished ability to receive an education in a racially integrated school—is, beyond any doubt, not only judicially cognizable, but as shown by cases from *Brown v. Board of Education* to *Bob Jones University v. United States,* one of the most serious injuries recognized in our legal system.[17]

468 U.S. at 756, 104 S.Ct. at 3327. (Citations omitted).

We find no difficulty in holding that plaintiffs have alleged an injury which is judicially cognizable. We now turn to consideration of the second prong of the formulation enumerated in *Allen,* the requirement of causation.

### 2. *Causation*

Plaintiffs claim that their injury is "fairly traceable" to the action or inaction of defendants. As the legislative history shows, the intent and purpose of Congress in its enactment of Title VI was twofold: to prevent the use of federal funds to support discriminatory practices and to provide individuals effective protection against such practices. *Cannon v. University of Chica-*

---

tions, 100th Cong., 1st Sess., Report on Failure and Fraud in Civil Rights by the Department of Education. In this Report, the Committee states that Arkansas and nine other southern and border states have failed in their commitments to reduce racial discrimination in their colleges and universities.

**17.** The court, in *Allen,* also held that a claim of injury posited on the "mere fact of government financial aid to discriminatory private schools" is not judicially cognizable, whether viewed as a claim to have the government avoid the violation of law alleged in the complaint or as "a claim of stigmatic injury, or denigration, suffered by all members of a racial group when the government discriminates on the basis of race." 468 U.S. at 752, 754, 104 S.Ct. at 3325, 3326.

*go,* 441 U.S. 677, 704, 99 S.Ct. 1946, 1961 60 L.Ed.2d 560 (1979). There is no doubt but that Congress designed Title VI to put an end to discrimination in the administration of Federal programs, and thereby to promote the national policy of non-discrimination. The same national policy is reflected in the passage of several statutes following on the heels of Title VI, *i.e.,* Title VII (discrimination in employment) and Title IX (discrimination based on sex). But the above statements of purpose and intent do not alone solve the problem of whether plaintiffs' injury, which we hold to be judicially cognizable, is "fairly traceable" to the challenged conduct of defendants.

It is defendants' basic position that the educational institutions themselves and the political entities, both state and local, are "the direct causation of the discrimination of which plaintiffs complain." Defs.Memo. at 16–17. They claim that it is the conduct of these independant institutions and political entities, and not the action or inaction of defendants, which has caused plaintiffs' injury. Accordingly, they assert that the causal relationship between defendants' actions and plaintiffs' injury is too indirect and attenuated to supply the indispensible link of causation. Defs.Memo. at 20. In addition to *Allen, supra,* defendants strongly rely upon two other Supreme Court decisions, *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) and *Warth v. Seldin, supra.* In each of these cases, the party directly causing the alleged injury was a third-party, and the participation of the governmental entity was indirect and tangential. In each case standing was denied for lack of causation.

In the instant case, defendants are not charged with causing injury to plaintiffs directly, but rather indirectly, by providing financial assistance to educational institutions and states which engage in discriminatory practices. Defendants are not charged with a policy of non-enforcement, but rather with assisting in the unlawful practices of educational institutions by failing to promptly process complaints and compliance reviews according to certain time frames, and by failing to proceed against states which have failed to comply with statewide plans for the desegregation of institutions of higher education. The injury of which plaintiffs complain is caused by the conduct of independent third parties who are not before this court, *i.e.* the educational institutions and the states. It is entirely speculative whether a more rigid enforcement of time frames governing the administrative processing of complaints or the cut-off of Title VI funds, the ultimate sanction, would affect the decisions of these entities or lead to changes in policy. As was said in *Allen,* referring to *Simon, supra:*

> The causal connection [in *Simon* ] depended on the decisions hospitals would make in response to withdrawal of tax-exempt status, and those decisions were sufficiently uncertain to break the chain of causation between plaintiffs' injury and the challenged Government action.

468 U.S. at 759, 104 S.Ct. at 3328–29.

Similarly, the decisions of educational and political institutions in response to the threatened or actual cut-off of funds in this context cannot be predicted with certainty. To believe that strict enforcement of time frames in the administrative processing of complaints or of time frames for compliance with state plans would redress the injury of which plaintiffs complain, is to indulge in speculation. The connection between plaintiffs' injury and defendants' action or inaction is too indirect to provide a proper nexus.

It should not be forgotten that the discriminatory practices of which plaintiffs' complain existed long before the passage of the Civil Rights Act of 1964. They were not caused by defendants. They have been continued, and maintained to the extent they presently exist, not by defendants, but by the schools and states themselves, where these practices have unfortunately long been customary. Any effect plaintiffs suffer as a result of the grant of federal assistance to these separate and independant entities is similar to the effect of the refusal to deny Section 501(c)(3) tax exempt status discussed in *Allen, supra.* It is

indirect, attenuated and speculative. In no sense is such injury "fairly traceable" to defendants' conduct.

### 3. *Redressability*

■ As is frequently the case, the concepts of causation and redressability are closely related. This is especially so in the instant action. Since the injury of which plaintiffs' complain is not sufficiently linked to the action or inaction of defendants, it is also speculative to predict that the close monitoring of the day-to-day affairs of two arms of the Executive Branch, the DE and DOL, would remedy or even attenuate this injury. The effect of terminating, or threatening to terminate, federal aid to institutions continuing discriminatory practices, is even more speculative. This is especially so in the area of higher education.

### a. *Higher Education*

The most difficult problems in educational desegregation exist in the area of higher education. This was recognized long ago, when the Court of Appeals in *Adams I, supra,* affirmed the injunctive relief provided by this court with one single exception. With regard to institutions of higher education, the Appeals Court extended the period of compliance with Title VI by lengthening to 120 days the time within which a state was required to submit a plan for eventual desegregation, and, if an acceptable plan had not been submitted within 180 days, the initiation of compliance procedures. *Adams I,* 480 F.2d at 1165. The court recognized the problems of integrating higher education when it noted:

> Perhaps the most serious problem in this area is the lack of state-wide planning to provide more and better trained minority group doctors, lawyers, engineers and other professionals. A predicate for minority access to quality post-graduate programs is a viable, coordinated state-wide higher education policy that takes into account the special problems of minority students and of Black colleges. As *amicus* points out, these Black institutions fulfill a crucial need and will continue to play an important role in Black higher education.

*Id.* at 1164–65. We stressed this thought in our Second Supplemental Order of April 1, 1977. *Adams v. Califano,* 430 F.Supp. 118 (D.D.C.1977). That order addressed the failure of certain southern states to submit acceptable plans for desegregation, and ordered defendants within 90 days to promulgate the ingredients of an acceptable higher education desegregation plan, and within 60 days thereafter to require the states of Arkansas, Florida, Georgia, North Carolina, Oklahoma, and Virginia to submit revised plans. *Id.* At the same time, we stated:

> The process of desegregation must not place a greater burden on Black institutions or Black students' opportunity to receive a quality public higher education. The desegregation process should take into account the unequal status of the Black colleges and the real danger that desegregation will diminish higher education opportunities for Blacks. Without suggesting the answer to this complex problem, it is the responsibility of HEW to devise criteria for higher education plans which will take into account the unique importance of Black colleges and at the same time comply with the Congressional mandate.

*Id.* at 120.

The lack of integration in higher education remains [18] despite the passage of more than a decade, and was the focus of our March 24, 1983 order presently under review. The explanations are easily found and may be judicially noticed. First, there is the inherent difficulty of increasing Black enrollment in predominantly white public institutions, stemming at least in part from current admissions standards, which many Blacks, because of inferior secondary education, find difficult to meet. It is no secret that many of the Black eligibles with proper academic qualifications are persuaded to attend private out-of-state institutions offering scholarships and other financial aid. Extensive recruiting efforts

---

**18.** *See* footnote 16.

have not been entirely successful. Second, white enrollment in predominantly Black institutions has also lagged but for different reasons, among them the diminished academic quality of these institutions and their poorer facilities. In order to bring Black institutions up to equality and make them competitive with white institutions state legislatures will have to act to supply the needed funds for the hiring of faculty and the expansion of physical plant and facilities.

These conditions long antedated the passage of Title VI in 1964 and are conditions over which defendants have no control. They were not caused by any action of defendants and are not "fairly traceable" to anything defendants have done or have failed to do. It is overly sanguine to believe that the enforcement of time frames or the defendants' ultimate weapon of cutting off funds will achieve the desired results of substantial compliance. In the case of Black institutions, in addition to being ineffective, the effect of cutting off federal funds might well be devasting. Funding from state and local sources is already in short supply. The record in this case indicates that many of the 104 Black colleges would have serious difficulty surviving if federal funding were eliminated. The injury of which plaintiffs complain, particularly in the case of state institutions of higher learning, is not redressible by the relief which plaintiffs seek.

### b. *Local School Districts*

The record in the case of local school districts, composed of elementary and high schools, has been less bleak. For the fiscal year 1982 through 1984, the OCR received 5,715 complaints and closed 6,477 complaints. Defs.Memo., Statement of Frederick G. Tate, at 2. However, there is nothing in the record before us which indicates how these complaints were resolved and we can only speculate as to the merits of these complaints, the investigations which took place, the results of the compliance reviews, whether letters of findings were issued, and whether the defendants' compliance procedures have been instrumental in redressing the particular injury plaintiffs

have asserted or will assert in the future. In any case, we find that the injury of which plaintiffs complain would not be redressible by the relief which plaintiffs seek, even in this context.

### B. *Separation of Powers*

■ Finally, in concluding this discussion of plaintiffs' standing, we repeat again the recent pronouncement of the Supreme Court that "the law of Article III standing is built on a single basic idea—the idea of separation of powers." *Allen*, 468 U.S. at 752, 104 S.Ct. at 3325. As a corollary to this concept, the Court referred to the "well established rule that the government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Id.* at 761, 104 S.Ct. at 3329–30. (Citations omitted). It pointed out that in the Article III context this principle:

> ... counsels against recognizing standing in a case brought, not to enforce specific legal obligations whose violations work a direct harm, but to seek a restructuring of the apparatus established by the Executive Branch to fulfill its legal duties. The Constitution, after all, assigns to the Executive Branch, and not to the Judicial Branch, the duty to 'take care that the Laws be faithfully executed.' United States Constitution, Art. II, § 3. We could not recognize respondents' standing in this case without running afoul of that structural principle.

*Id.*

On two previous occasions, the Court of Appeals has referred to the scope of our original order as requiring only the initiation of the enforcement process, and not the perpetual supervision of the details of any enforcement program. *Adams I*, 480 F.2d at 1163 n. 5 ("the order merely requires initiation of a process which ... will then pass beyond the District Court's continuing control and supervision"); *Adams II*, 711 F.2d at 165 (D.C.Cir.1983) ("Judge Pratt correctly interpreted the initial decree not to extend to supervision of the Department's settlement of its enforcement action against North Carolina").

The orders of March 11, 1983 and March 24, 1983 not only go well beyond the initi-

ation of the enforcement process, but, through the detailed imposition of precise time frames governing every step in the administrative process, seek to control the way defendants are to carry out their executive responsibilities. The fact that the government for the most part consented to these burdens is of no consequence. More importantly, plaintiffs do not claim that defendants have abrogated their statutory responsibilities, but rather that, in carrying them out, they do not always process complaints, conduct investigations, issue letters of findings, or conduct compliance reviews as promptly or expeditiously as plaintiffs would like. As was said in *Laird v. Tatum*, 408 U.S. at 15, 92 S.Ct. at 2326 and quoted with approval in *Allen*, 468 U.S. at 760, 104 S.Ct. at 3329:

> Carried to its logical end, [respondents'] approach would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for Congress acting through its committees and the 'power of the purse'; it is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action.

Thus, entirely apart from plaintiffs' failure to meet the causation and redressability elements of standing, the orders under review intrude on the functions of the Executive branch and violate the doctrine of separation of powers, which is the basic core of standing.

### C. *Mootness*

The jurisdiction of federal courts to review agency action is dependent on the existence of an actual "case or controversy." *O'Shea v. Littleton*, 414 U.S. 488, 493, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). Our lack of authority to review moot cases stems from the very same Article III "case or controversy" requirement. *DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 1705, 1706, 40 L.Ed.2d 164 (1974).

### 1. *Plaintiffs in WEAL*

Plaintiffs' complaint in *WEAL* seeks, in the form of both declaratory and injunctive relief, the enforcement of laws barring sexual discrimination. An amended complaint consisting of five (5) counts was filed on January 28, 1975.

Count I charges the defendants Secretary of HEW and the Director of OCR with failure to enforce Executive Order No. 11246, as amended by Executive Order No. 11375. Amended Complaint ¶¶ 30–64. Defendants assert that as of October 8, 1978, the duty of enforcing these Executive Orders was transferred to the Department of Labor and therefore that the claims against the HEW Secretary and its OCR Director are now moot. Defs.Memo. at 28.

Count II charges the DOL and the OFCCP with failure to enforce these Executive Orders due to DOL's failure to monitor and correct deficiencies in HEW's compliance program. Amended Complaint, ¶¶ 65–69. Defendants assert that the responsibility for enforcing the Executive Order has since October, 1978 resided with DOL and therefore that these claims are also moot. Defs.Memo. at 29.

Count III charges HEW and OFCCP with certain procedural violations in administering the Executive Order. Amended Complaint, ¶¶ 70–77. Defendants assert that two of the three individual complainants filed stipulated dismissals in early 1985 and that the third, Elizabeth Farians, no longer has any complaint pending. Defs.Memo. at 29.

Count IV charges HEW with failure to promulgate final regulations implementing Title IX of the Education Amendments Act of 1972. Amended Complaint, ¶¶ 78–88. Defendants assert that on June 4, 1975, the final regulations under Title IX were promulgated. Defs.Memo. at 30.

Count V charges HEW with failure to enforce Titles VII and VIII of the Public Health Service Act, 42 U.S.C. § 295h–9 (1970), 42 U.S.C. § 298b–2 (1976), by failing to issue final rules and regulations. Amended Complaint, ¶¶ 89–95. Defendants respond that under the Department of Education Organization Act, 20 U.S.C. § 3441 (1979), defendant Department of Education transferred its enforcement responsibilities

to the Department of Health and Human Services (HHS), and that HHS is no longer a party to this litigation. Defs.Memo. at 30.

The WEAL plaintiffs, in a lengthy opposition to defendants' motion to dismiss, do not meet head on defendants' claims of mootness. Rather, they cite a long litany of cases where complaints under Title IX and Executive Order No. 11246 have not been acted upon and compliance reviews have not been undertaken within the prescribed time frames.

2. *Plaintiffs—Intervenors in Adams*

Defendants claim that all of the complaints of the plaintiff-intervenors in *Adams* concern HEW's past policy of non-enforcement of Title IX, Section 504 of the Rehabilitation Act of 1973 and Title VI with respect to national origin discrimination complaints. Accordingly defendants assert that, "since any policy regarding Title IX, Section 504 and Title VI national origin discrimination complaints is no longer effective, the action brought by these intervenors are moot." Defs. Memo. at 32.

A detailed analysis of each of defendants' claims of mootness with respect to each of the multitude of matters raised by the *WEAL* plaintiffs and the plaintiff-intervenors in *Adams* is difficult on the basis of the record before us. In view of our treatment of the issue of standing, we prefer to avoid this unnecessary and possibly indecisive exercise and make no determination concerning defendants' claims of mootness.

### III. *Conclusion*

For all of the reasons set forth above, it is our holding that all of the plaintiffs and intervenors in *Adams*, as well as all of the plaintiffs in *WEAL*, lack standing to continue this litigation.

Accordingly, we grant defendants' motion to dismiss.

### APPENDIX

*PARTIAL CHRONOLOGICAL INDEX OF RELEVANT DECISIONS AND ORDERS*

\* *Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir.1973) [*Adams I*], affirming 356 F.Supp. 92 (D.D.C.1973).

\* *Adams v. Weinberger,* 391 F.Supp. 269 (D.D.C.1975) [First Supplemental Order].

\* *Adams v. Califano,* 430 F.Supp. 118 (D.D.C.1977) [Second Supplemental Order] (Modified unpublished order of March 14, 1975).

\* *Adams v. Califano* No. 3095–70 (D.D.C. December 29, 1977) [Consent Decree] (basis for March 11, 1983 and March 24, 1983 Orders).

\* *North Carolina v. Department of Education* No. 79–217–CIV–5 (E.D.N.C. July 17, 1981) (Approved consent settlement between the Department of Education and the State of North Carolina).

\* *Adams v. Bell,* 711 F.2d 161 (D.C.Cir. 1983) [*Adams II*] (affirming this court's refusal to enjoin the Department of Education from entering into a consent settlement with the State of North Carolina).

\* *Adams v. Bell,* No. 3095–70 (D.D.C. March 11, 1983) (Order modifying the terms of the 1977 Consent Decree).

\* *Adams v. Bell,* No. 3095–70 (D.D.C. March 11, 1983) (Order denying defendants' motion to vacate the December 29, 1977 Consent Decree).

\* *Adams v. Bell,* No. 3095–70 (D.D.C. March 24, 1983) (Order modifying 1977 Consent Decree with respect to issues pertaining to state-wide systems of higher education).