Gale COKER, et al, Plaintiffs,

v.

Otis R. BOWEN, M.D., et al,
Defendants.

Civ. A. No. 86–2448.

United States District Court,
District of Columbia.

April 11, 1989.

Glen B. Manishin, Maria Fascarines, Nat'l Coalition for Homeless, Washington, D.C., for plaintiffs.

Mark E. Nagle, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

JOHN GARRETT PENN, District Judge.

Plaintiffs brought these actions to require the Department of Health and Human Services ("HHS") to monitor and enforce the states' compliance with their emergency assistance (EA) plans. Specifically, plaintiffs seek to have HHS compel the states to fully adhere to their commitments to provide emergency shelter assistance ("ES") (either actual shelter or cash payments). The plaintiffs include two homeless families who have been denied emergency shelter assistance, one from Maryland and one from Illinois; the National Union of Homeless (NUH), an organization comprised of homeless or formerly homeless people; and the National Coalition for the Homeless (NCH), an advocacy and service organization.

Plaintiffs state three claims against HHS for which they seek declaratory and injunctive relief under the Administrative Procedure Act (the "APA"): [1] (1) failure to monitor the states for compliance with their EA plans as required by regulations; (2) abdication of all enforcement actions permitted under the statute and regulations; and (3) arbitrary and capricious enforcement—ie.) enforcement when EA is improperly granted, but not when it is improperly denied. The crux of plaintiffs' claim is that HHS

---

1. They assert no claims directly under Title IV of the Social Security Act, 42 U.S.C. § 601 *et seq.*

has allowed states to systematically deny ES to eligible homeless families.

This matter is now before the Court on the defendants' motion to dismiss. The defendants assert as grounds for the motion that this Court lacks jurisdiction over the subject matter of this action, and plaintiffs have failed to state a claim upon which relief can be granted.

The defendants raise three issues as to the justiciability of this case and the reviewability of plaintiffs' claims: (1) the defendants argue that the plaintiffs do not meet the constitutional criteria for standing because their injuries have been caused by the states and are not likely to be redressed through the relief sought against HHS, (2) they assert that the case is not reviewable under the APA, 5 U.S.C. § 701(a)(2), because under *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed. 2d 714 (1985), enforcement decisions are presumed to be unreviewable as acts committed to agency discretion, (3) and finally relying on *Council for the Blind v. Regan*, 709 F.2d 1521 (1983), they assert that the case is unreviewable under the APA, 5 U.S.C. § 704, because plaintiffs have adequate remedies through individual hearings, or through suits directly against the states. Because this Court concludes that the plaintiffs lack standing, the Court will not address the last two issues.

I.

The EA provisions are found within those covering aid to families with children under Title IV–A of the Social Security Act ("the SSA"). *See* 42 U.S.C. §§ 603(a)(5) and 606(e)(1). AFDC is the core of Title IV–A. EA, on the other hand, is an optional program in which approximately 28 states participate. The states must specify in their EA plans the types of services they wish to provide, such as emergency shelter, and their plans must provide that EA will be provided forthwith. 45 C.F.R. § 233.120(a). They are reimbursed by the federal government for 50% of the funds which they spend on the program. 42 U.S. C. § 603(a)(5).

Congress intended that the EA program would not have all of the procedural trappings of the AFDC program. *Quern v. Mandley*, 436 U.S. 725, 744, 98 S.Ct. 2068, 2079, 56 L.Ed.2d 658 (1978). Thus, the Court in *Quern* concluded that state provisions for EA, unlike those for AFDC, can have more restrictive eligibility standards than those recommended in the statute. The Court held that § 606(e) imposes permissive, not mandatory, standards of eligibility on participating states, and that therefore, a state could restrict EA to AFDC recipients and those presumptively eligible for AFDC. States, however, cannot completely and automatically exclude AFDC recipients from eligibility for EA. *Blum v. Bacon*, 457 U.S. 132, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982).

There are no enforcement provisions in the statute or regulations which specifically refer to EA, as the statute and regulations refer to the public assistance plans in general. The Act at 42 U.S.C. § 604(a) provides for the withholding of payments to states found by HHS to be in substantial noncompliance with any provision required by § 602(a) to be included in the plan. HHS has the discretion to withhold all payments or just those for the part of the plan affected. Some of the provisions of § 602(a) apply to the plan as a whole, while others refer specifically to AFDC and therefore apply only to AFDC. *Quern*, 436 U.S. at 741–742, 98 S.Ct. at 2077–2078. The requirements of § 602(a) deal mainly with the administration of the plan, although they place certain substantive obligations upon the states. *See Canady v. Koch*, 608 F.Supp. 1460, 1471 (S.D.N.Y. 1985). As discussed above, the provision of EA is not one of the substantive requirements. Plaintiffs have not identified requirements of § 602(a), the violation of which is resulting in the denial of shelter to eligible families.

The relevant monitoring and enforcement regulations are found at 45 C.F.R. § 201.6(a) (withholding) and §§ 201.-10–201.13 (review and audit). These regulations appear to apply to the states' plans as a whole, which include all family assistance programs under Titles I, IV–A, VI, X,

XIV, XVI, and XIX of the SSA. Section 201.6(a) authorizes withholding of payments to a state in whole or in part when the state's public assistance plan or administration of the plan fails to comply with *federal* requirements such as those in 42 U.S.C. § 602. The provisions in §§ 201.10—201.13 provide the basis for determining that action under § 201.6 is necessary. Section 201.10 provides that HHS will review the states' adherence to federal requirements *and to the other provisions of their plans.* HHS is to conduct a "continuing observation" of the states' quality control systems. § 201.10(b). Quality control systems are used to monitor case errors, which include underpayment and wrongful denials of assistance. 45 C.F.R. § 205.40. Section 201.12 provides that HHS will conduct audits to determine whether states are properly spending funds. Finally, § 201.13(b) provides that if the "reviews reveal serious problems with respect to compliance with any Federal requirement, the State agency is required to correct its practice so that there will be no recurrence of the problem in the future."

Section 201.10 provides the strongest support for plaintiffs' argument that HHS is required to monitor the states' adherence to their EA provisions. However, the enforcement regulations clearly focus on the federal requirements. For a program such as AFDC, the eligibility standard is a federal requirement, but for EA, the states have wide latitude in determining eligibility, *Quern, supra,* although at a minimum they must not automatically exclude AFDC recipients. *Blum, supra.*

## II.

■ The constitutional requirements for standing are (1) a concrete injury which is more than a generalized grievance shared by the population at large; (2) an injury which is fairly traceable to the actions of the defendant; and (3) an injury which is substantially likely to be redressed by relief against the defendant. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The standing inquiry should not be a mask for a court's view of the merits of the case. *See Allen v. Wright,* 468 U.S. 737, 782, 104 S.Ct. 3315, 3341, 82 L.Ed.2d 556 (Brennan, J., dissenting). The lack of any other person who would have standing to seek redress for a violation of the law does not mean that plaintiffs must have standing. *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 227, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974).

### A.

■ There is no dispute that the alleged improper denial of ES to homeless families is an injury upon which standing can be based.[2] Plaintiffs, however, give no support for their position that denial of "compliance mechanisms for their benefit" is a judicially cognizable injury. Recognizing it as such would render the standing doctrine meaningless. The alleged denial of compliance mechanisms here is no more of an injury than was the denial of prosecutions of fathers who failed to pay child support for illegitimate children in *Linda R.S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

HHS disputes whether the NUH has stated a sufficient injury since it has not identified particular members who have been wrongfully denied ES. HHS also disputes whether the NCH has suffered a sufficient organizational injury upon which to base standing.

■ Since the case should not be dismissed if any of the plaintiffs has standing, the Court does not need to decide whether the NUH or the NCH have stated an injury, as the injury requirement is met by the

---

**2.** The characterization of the injury suffered by the plaintiffs is important, as they emphasize that the plaintiff families and other families have been *systematically* denied emergency shelter. If, for example, plaintiffs were just alleging that they were denied shelter because of the incompetence or the erroneous ruling of a state employee, they clearly would not have standing. Their injury would be too far removed from the actions of HHS which has no duty to review every case or to take enforcement action for wrongful denial of ES.

homeless families. *See International Union v. Brock,* 783 F.2d 237, 246 n. 12 (D.C. Cir.1986). In any case, it appears that even though the NUH has not identified members who have been injured, it has made sufficient allegations to survive this motion. *See National Wildlife Federation v. Burford,* 835 F.2d 305, 312–313 (D.C.Cir. 1987). Furthermore, it appears that the NCH has alleged sufficient injuries to its organizational activities to meet the injury requirement under the Supreme Court's holding in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). *See also Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 937 (D.C.Cir.1986). If its allegations are true, the NCH is not a bystander claiming injury merely because it has chosen to be concerned about an issue. Rather, it is an organization actively providing various forms of aid to homeless families, and it alleges that it has had to provide increased services because of the states' failure to do so.

### B.

█ The "causation" or "traceability" requirement looks at the nexus between the defendant's action and the harm, while the "redressability" requirement looks at the nexus between the harm and the relief available. *Mideast Systems and China Civil Const. v. Hodel,* 792 F.2d 1172 (D.C. Cir.1986). The causation and redressability requirements are not to be applied mechanically, and although courts look to past decisions of the Supreme Court for guidance by comparison, "it is up to courts to determine whether a particular party is properly before the court." *Id.* at 1176–1177. While plaintiffs' factual allegations must be accepted as true for the purposes of a motion to dismiss, the Court must determine the legal sufficiency of the connections between the alleged injury, the challenged agency action, and the remedy sought. *See Community for Creative Non-Violence v. Pierce,* 814 F.2d 663, 668–670 (D.C.Cir.1987) (*"CCNV"*). Where, as here, the relief sought is the action withheld, and both inquiries require an assessment of how third parties will respond to

an agency's action, the causation and redressability components are closely related. *See id.* at 670; *see also Mideast Systems* 792 F.2d at 1176.

HHS points out that any injury that it has caused is indirect, and that the states have directly caused plaintiffs' injuries. HHS argues further that it is purely speculative whether states will respond to increased federal monitoring and enforcement by providing more ES. The Agency emphasizes that the EA programs, as well as the ES provisions, are voluntary, and that the ultimate sanction of withholding funds from states is unlikely to result in the provision of shelter for the homeless. It relies most heavily on *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), and also upon *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), *Linda R.S., supra,* and *Mideast Systems, supra,* for the proposition that standing is doubtful where an independent third-party stands between the injury alleged and the relief sought. HHS also cites two unpublished decisions in cases where it successfully defended on the ground that plaintiffs lacked standing where a third-party directly caused the harm. *Lewallen v. Ledbetter,* No. C85-2891A (N.D.Ga. Order filed March 11, 1987); and *Ingerson v. Pratt,* No. 76-3255-S (D.Mass. Memorandum filed September 17, 1981).

The essence of plaintiffs' argument is that if not for HHS' inaction, the states would not systematically deny ES to eligible families (including the homeless plaintiffs). Plaintiffs argue that the states are not supposed to be independent actors, and citing *International Ladies' Garment Workers Union v. Brock,* 722 F.2d 795, 811–812 (D.C.Cir.1983), *cert. denied,* 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984), they argue that the Court should presume that the compliance mechanism in the statute is effective. Plaintiffs assert that an increased likelihood of tangible relief is all that is necessary to meet the redressability requirement.

While the fact that ultimate relief to the plaintiffs depends on the actions of third parties does not by itself defeat standing, it may make it substantially more difficult to meet the minimum requirements of Article III. *CCNV*, 814 F.2d at 668 (plaintiffs alleging that a report issued by the Department of Housing and Urban Development would decrease support for the homeless lacked standing since predicted reaction to the report was speculative); *Von Aulock v. Smith*, 720 F.2d 176, 181 (D.C.Cir.1983) (employees lacked standing to challenge EEOC interpretive bulletin since it was highly likely that employers would have continued to maintain their challenged plans in the absence of the bulletin); *see also Mideast Systems*, 792 F.2d at 1178 (unsuccessful bidder lacked standing to challenge Department of Interior's failure to require third-party to comply with conflict of interest regulation since the ultimate relief depended on the third-party's independent decision to award the contract). The mere possibility that causation is present is not enough; the presence of an *independent* variable between either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing should be denied. *Mideast Systems*, 792 F.2d at 1178.

Several cases decided by the Supreme Court bear this out. In *Simon, supra,* the Court held that indigents lacked standing to challenge IRS regulations reducing the amount of free medical care hospitals must provide in order to retain tax benefits available for charitable organizations. The Court found it "purely speculative whether the denials of service specified in the complaint fairly can be traced to [the IRS's] 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." 426 U.S. at 43, 96 S.Ct. at 1926.

In *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), the Court determined that parents of black children attending public schools in districts undergoing desegregation had no standing to challenge the government's allegedly unconstitutional grant of tax exemptions to racially discriminatory schools. The Court

thought it speculative whether the denial of tax exemptions to such schools would affect the ability of plaintiffs' children to receive a desegregated education, since that depended upon the independent reactions of the schools and the parents of the children in schools to the withdrawal of tax exemptions. *Id.* at 759, 104 S.Ct. at 3329.

In *Linda R.S., supra,* the Court held that the plaintiff, the mother of an illegitimate child, did not have standing to challenge the failure of the district attorney to prosecute fathers of illegitimate children for their failure to pay child support. The Court found it speculative whether incarceration of the father would result in future payments of support. 410 U.S. at 618, 93 S.Ct. at 1149.

The most often cited rationale supporting the Court's decisions in these cases is that a close nexus between the unlawful action, the harm, and the remedy is required to ensure the full litigation of the dispute and to avoid advisory opinions and useless litigation. Presumably, the absence of the third-party directly causing the harm will deprive courts of fully briefed issues, and it will render any relief speculative. These decisions have been harshly criticized as manipulative and as substitutes for the majority's opinions of the merits of the cases. *See, e.g., Allen*, 468 U.S. at 782, 104 S.Ct. at 3341 (Brennan, J., dissenting); L. Tribe *American Constitutional Law* 130 (1987). However, a new underlying rationale has emerged in these cases, and that is the doctrine of the separation of powers. *See Allen*, 468 U.S. at 760–761, 104 S.Ct. at 3329–3330; *see also Haitian Refugee Center v. Gracey*, 809 F.2d 794, 801–807 (D.C. Cir.1987) (Bork, J.); L. Tribe *American Constitutional Law* 109–111 (1987).

It is unclear how the separation of powers principles affect the standing analysis. The Court in *Allen* stated that the principle of granting the Government the "widest latitude" in the dispatch of its own internal affairs "counsels against recognizing standing in a case brought, not to enforce *specific legal obligations* whose violation works a *direct harm*, but to seek a restructuring of the apparatus established by the

Executive Branch to fulfill its legal duties." 468 U.S. at 761, 104 S.Ct. at 3330 (emphasis added). The Court noted that it relied on the separation of powers principles to interpret the traceability requirement. *Id.* at n. 26. Thus, although the Court provided no test, *see* 468 U.S. at 793, 104 S.Ct. at 3346 n. 10 (Stevens, J., dissenting), under *Allen,* an assertion of standing in a suit against the Government is particularly weak where the alleged harm is indirect or where no specific legal violations are alleged.

An example of this Circuit's attempt to deal with *Allen* is provided by the litigation originally known as *Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir.1973). In light of the separation of powers concerns discussed in *Allen,* the Court of Appeals remanded the action against the Secretary of the Department of Education for consideration of plaintiffs' standing. *Women's Equity Action League v. Bell,* 743 F.2d 42 (D.C.Cir.1984). Plaintiffs had originally brought suit to compel the Secretary to the nondiscrimination provisions of Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d *et seq. See Adams v. Richardson, supra.* As the case proceeded, the Court became increasingly involved through a series of decrees in the day-to-day operations of agencies of the Executive Branch. *Adams v. Bennett,* 675 F.Supp. 668, 670 (1987). On remand, the Court concluded that "[i]t is entirely speculative whether more rigid enforcement of time frames governing the administrative processing of complaints or the cut-off of Title VI funds, the ultimate sanction, would affect the decisions of [the discriminatory institutions] or lead to changes in policy." *Id.* at 677.[3] It is not clear how the separation of powers concerns affected the Court's analysis, but *Allen* did appear to affect the result.

■ In *CCNV,* the Court of Appeals discusses a general framework for analyzing standing in third-party causation cases. 814 F.2d at 668–670. To show a legally

sufficient connection between the alleged injury and the challenged agency action, plaintiffs must allege facts which show that the agency's action is more than one of many factors whose relative influence may affect the third-party's behavior. *Id.* at 669. The facts alleged must show that the agency is a substantial factor motivating the third party's actions against plaintiffs. *Id.* Furthermore, the requested relief must be substantially likely to redress the injury complained of. *Id.* at 670. The court in *CCNV* did not state a requirement of harm separate from that directly caused by the third party.

■ Taking all of the above into account, the key inquiry here is whether, under the statutory and regulatory schemes involved, HHS is a substantial factor affecting the states' actions against the plaintiffs, to the extent that granting the relief requested against HHS would be substantially likely to redress plaintiffs' injuries. This inquiry determines the extent to which the states are independent variables which might render the ultimate relief speculative. The connections between the injury and the alleged unlawful conduct will be closest when a violation of a specific legal obligation is alleged, as opposed to an unlawful exercise of discretion. An alleged failure to take discretionary action is a particularly weak link in a causal chain where enforcement decisions are involved. *See, e.g., Linda R.S.,* 410 U.S. at 618, 93 S.Ct. at 1149; *see also Allen,* 468 U.S. at 792, 104 S.Ct. at 3346 (Stevens, J., dissenting).

Plaintiffs allege that but for HHS's failure to monitor the state plans for improper denials of EA, they would have received the shelter assistance to which they were entitled. Plaintiffs alleged chain of causation is that if HHS had monitored the states for underpayment and improper denials of payments, it would have discovered that some states are systematically denying emergency shelter assistance to eligible

---

**3.** The Court stated that defendants were not charged with a policy of non-enforcement, but rather with assisting in unlawful practices. *Adams v. Bennett,* 675 F.Supp. at 677. The Court did not explain the significance of this

distinction, and it would appear that unlawful assistance of discrimination is more closely related to the plaintiffs' injuries than is a policy of nonenforcement.

families, and if HHS had not abdicated its enforcement duties, it could have taken enforcement actions which would have compelled the states to provide emergency shelter to all eligible applicants. Plaintiffs have alleged that in failing to monitor, HHS has violated its regulations. For the purpose of this motion, we can assume that some states are in substantial noncompliance with provisions in their EA plans, and that they are systematically denying emergency shelter to eligible families. Plaintiffs assert that the Court should also assume that the withholding of funds as provided for by 42 U.S.C. § 604 will be effective in compelling the states to comply with their plans.

### III.

At a minimum, to show that HHS is a substantial factor in the denial of EA to eligible families, plaintiffs have to allege facts which show that in implementing their plans, the states are violating federal requirements, and that the violation of these requirements results in the denial of EA to eligible families. HHS might be a substantial influence on the states' compliance with the federal requirements, since the states have indicated that they want the benefits of participation in the EA program, and that they are willing to meet the federal requirements in order to get them.

The optional state provisions are distinguishable from the federal requirements which Congress or the Agency have made a condition of the states' receiving the benefits of participation in the EA program. If a state is violating a provision in its plan which is not a federal requirement, it could remedy that violation by changing its plan. Thus, although states are obligated to adhere to their optional provisions, *Koster v. Webb*, 598 F.Supp. 1134 (1983),[4] it is speculative whether federal enforcement of those provisions will lead to additional assistance where the states are at liberty to drop those provisions from their plans. *See, e.g. Quern.* Furthermore, the Act and

the regulations clearly focus on the enforcement of federal requirements. 42 U.S.C. § 604; 45 C.F.R. §§ 201.6 and 201.-13. This is not to say that HHS has no authority or duty to monitor and enforce the states' adherence to the optional provisions of their plans. *See eg* 45 C.F.R. § 210.10. However, the traceability and redressability factors are too remote and speculative to grant plaintiffs standing to force the Agency to take such action.

The main point is that when it comes to eligibility and the amount of EA which the states provide, the states have broad discretion and flexibility. HHS, while not powerless, does not have the leverage over the states under this system to ensure that the relief plaintiffs seek here will be anything other than speculative. While the states might react to increased federal monitoring and enforcement of their programs by providing ES to all who are eligible, they might also limit eligibility, or limit the services provided under their EA programs, such as ES. They might also completely withdraw from the EA program. There is no reason to presume that the alleged mandated sanction of withholding further funds from a state that is in substantial noncompliance with federal regulations will also be effective in the enforcement of optional provisions. There is considerable doubt as to whether that sanction will be effective where the alleged violation is a failure to spend sufficient funds to meet the needs of eligible applicants for ES. Thus, HHS' control over the states' provision of ES to eligible applicants is speculative and indirect.

For the reasons discussed above, this Court concludes that the plaintiffs lack standing to bring this suit. Accordingly, defendants' motion to dismiss should be granted and this case should be dismissed. An appropriate Order has been entered.

---

4. The situation in *Koster* is clearly different from this case. There, plaintiffs were directly suing the state to enforce an alleged statutory entitlement to benefits. The court held that plaintiffs stated a claim, despite the fact that the states undertook the obligation voluntarily. It is quite different for plaintiffs here to allege that they would receive their benefits if HHS would attempt to coerce the states to adhere to their voluntary undertakings.