WOMEN'S EQUITY ACTION LEAGUE, et al., Appellants,

v.

Lauro F. CAVAZOS, Secretary of Education.

Nos. 88–5065, 88–5068 to 88–5071 and 88–5088.

United States Court of Appeals, District of Columbia Circuit.

Argued April 11, 1989.

Decided July 7, 1989.

Elliott C. Lichtman, with whom Mary M. Levy, Washington, D.C., Julius L. Chambers, James M. Nabrit, III, New York City, and Janell M. Byrd, Washington, D.C., were on the brief, for appellants Kenneth Adams, et al. and intervenors-appellants Jimmy Martinez, et al. in No. 88–5068 and No. 88–5065.

Marcia D. Greenberger, Washington, D.C., with whom Ellen J. Vargyas was on the brief, for appellants Women's Equity Action League, et al. and Buxton, et al. in No. 88–5065, No. 88–5068, No. 88–5069, No. 88–5070, and No. 88–5088.

Coleman S. Hicks and Matthew L. Jacobs, Washington, D.C., were on the brief for appellant National Federation of the

Blind in No. 88–5065, No. 88–5068, No. 88–5069, No. 88–5070, and No. 88–5088.

John D. Aldock and Cynthia W. Simon, Washington, D.C., were on the brief for appellants Association for Retarded Citizens of Georgia, et al. in No. 88–5071.

Hadrian R. Katz, Washington, D.C., and E. Richard Larson, New York City, also entered appearances for appellants in No. 88–5088.

Alfred Mollin, Attorney, Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Michael Jay Singer, Robert Loeb, and Matthew Collette, Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before RUTH BADER GINSBURG and SENTELLE, Circuit Judges, and RE,* Chief Judge.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

We confront in this case, commenced in district court in 1970, a fundamental question of standing to sue. We hold that plaintiffs have satisfied that threshold requirement and order that remaining issues in the case be briefed and argued in this court pursuant to a schedule settled by the parties with the assistance of the court's Chief Staff Counsel.

I.

This omnibus action opened in 1970 when black students attending racially segregated public schools in seventeen southern and border states complained of the dereliction of officers of the Department of Health, Education, and Welfare (HEW). The initiating plaintiffs alleged that, in violation of the fifth and fourteenth amendments and, most particularly, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1982), HEW's Office of Civil Rights (OCR)

continued to countenance the channeling of federal funds to racially discriminatory institutions. Plaintiffs' complaint encompassed, in six claims for relief, schools from the primary level on through higher education.

Title VI prohibits exclusion from participation in, denial of benefits of, and discrimination under any federally-assisted program on the ground of race or national origin. The measure directs each federal agency empowered to disburse federal funds to "effectuate" the anti-discrimination command. If "compliance cannot be secured by voluntary means," the agency may initiate a process leading to "the termination of or refusal to grant or to continue [federal financial] assistance." *Id.* § 2000d–1. The 1970 complaint, titled *Adams v. Richardson,* charged that the Secretary of HEW and the Attorney General had embarked on a deliberate policy designed to remove "the teeth of Title VI." This policy, the complaint alleged, comprised relaxed standards for compliance, reduced federal monitoring, and an "abandonment of HEW school aid terminations." Indicative of the pattern, plaintiffs' complaint noted that, "[i]n contrast to the cutoff of funds from forty-six segregated school districts between the summer of 1968 and the summer of 1969," HEW had terminated "[b]ut a single school district during the 1969–70 school year, and only a few districts thereafter."

Ruling on cross motions for summary judgment, and relying on an extensive record of depositions and documentary evidence, the district court granted plaintiffs' prayer for declaratory and injunctive relief on each of the six claims they had stated. The district judge reasoned: "Having once determined that a school district [or state] is in violation of Title VI, and having failed during a substantial period of time to achieve voluntary compliance, defendants have a duty to commence enforcement proceedings." *Adams v. Richardson,* 356 F.Supp. 92, 95 (D.D.C.1973). As a monitor-

* Of the United States Court of International Trade, sitting by designation pursuant to 28 U.S.C. § 293(a) (1982).

ing device, the district court directed HEW to submit periodic reports to counsel for the plaintiffs on all steps taken to comply with the court's injunctive provisions.

This court, sitting *en banc*, unanimously affirmed, modifying only the injunction concerning higher education; we ruled that the ten states involved in that facet of the case should be given another chance to submit desegregation plans before HEW had to begin enforcement proceedings. *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir.1973). Distinguishing cases in which courts properly decline to interfere with prosecutorial discretion, we explained:

> [T]his suit is not brought to challenge HEW's decisions with regard to a few school districts in the course of a generally effective enforcement program. To the contrary, [plaintiffs] allege that HEW has adopted a general policy which is in effect an abdication of its statutory duty. We are asked to interpret the statute and determine whether HEW has correctly construed its enforcement obligations.

*Id.* at 1162. In accord with the district court, we read Title VI to say that the federal agency lacks discretion to desist when its request to a state or school district for voluntary compliance is disregarded, *i.e.*, not met by appropriately responsive action on the part of the fund recipient within a reasonable time. *Id.* at 1163. Rather, we held, at that point, the agency is obliged affirmatively to enforce Title VI by effective means. We stressed that the district court did not endeavor to "resolve particular questions of compliance or noncompliance," but "merely require[d] initiation of a *process* which, [once initiated and] excepting contemptuous conduct, will then pass beyond the District Court's continuing control and supervision." *Id.* at 1163 & n. 5 (emphasis added).

After our *en banc* affirmation of the statutory requirement that federal officers install and maintain an effective enforcement process, the litigation expanded, first within the confines of the *Adams* Title VI case, then into new—albeit related—domains. The *Adams* plaintiffs sought further relief in 1974, complaining that HEW continued to resist moving beyond voluntary negotiations, and delayed too long in determining whether a complaint showed a violation of Title VI. Granting plaintiffs' application in March 1975, the district court extended its decree beyond districts or systems then presumptively in violation of Title VI. The district judge required HEW to process *all* complaints of racial discrimination barred by Title VI in the seventeen states then in question; he prescribed this timeframe: 90 days from receipt of a complaint to preliminary determination whether the school district is in or out of compliance with Title VI; absent a determination of compliance, an additional 90 days to secure voluntary corrective action; failing correction within the allotted total of 180 days, 30 additional days to commence an enforcement proceeding. *Adams v. Weinberger*, 391 F.Supp. 269, 273 (D.D.C.1975).

By 1976, other classes of complainants were permitted to intervene. The Women's Equity Action League (WEAL), which had initiated a separate action in 1974, became part of the enlarging litigation. WEAL, other women's organizations, and individual women sought enforcement of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1686 (1982) (subsequently amended by the Civil Rights Restoration Act, Pub.L. No. 100–259, 102 Stat. 28 (1988)), which prohibits discrimination on the basis of sex in educational institutions receiving federal funds. The WEAL plaintiffs also sought enforcement of Executive Order No. 11,246, 3 C.F.R. 339 (1964–1965), as amended by Executive Order No. 11,375, 3 C.F.R. 684 (1966–1970), *reprinted in* 42 U.S.C. § 2000e note (1982), proscribing discrimination by government contractors. Four Mexican–American students joined the case as intervenors to advance the claim that HEW was not enforcing Title VI with respect to national origin. *See Adams v. Mathews*, 536 F.2d 417 (D.C.Cir. 1976).

Following this court's allowance of the WEAL plaintiffs' intervention—an allowance the district court had denied—the 1975 *Adams* timeframe order was altered and extended. Containing terms negotiat-

ed with the defendants, a revised order issued in 1976 covering race, national origin, and sex discrimination under Title VI and Title IX; the order remained limited, however, to the seventeen southern and border states identified in the 1970 *Adams* complaint. Complementing the schedule already inaugurated for agency action on individual complaints, the 1976 order introduced a time schedule governing agency-initiated "compliance reviews" of entire educational institutions and school systems. That order continued and intensified the use of periodic reports to counsel for the plaintiffs as a monitoring device.

Completing the classes represented, the National Federation of the Blind (NFB) intervened in 1977. Relying on section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1982 & Supp. IV 1986), and section 904 of the Education Amendments of 1972, 20 U.S.C. § 1684 (1982), NFB complained of the failure of federal officers to process handicap discrimination complaints within a reasonable time and to conduct a reasonable number of handicap discrimination compliance reviews.

That same year, the parties reached an agreement which the district court entered on December 29, 1977 as a consent decree. The 1977 consent decree followed the pattern set in the 1976 order. It obligated federal officials to investigate non-frivolous complaints alleging discrimination in educational institutions receiving federal funds, and to conduct a reasonable number of compliance reviews; it set timeframes for individual complaint processing and agency-sparked compliance reviews, with leeway for situations in which witnesses were unavailable, or resources "inadequate," or circumstances "unusual." The decree was framed with reference to Title VI, Title IX, the Executive Order, and section 504 (thus encompassing race, national origin, gender, and handicap), and it applied to the defendants' enforcement obligations nationwide.[1]

As the litigation acquired its omnibus character, one portion remained discrete: the part of the *Adams* complaint that concerned institutions of higher education in several southern and border states and their desegregation plans. *See supra* p. 882. The district court revisited that complex matter in 1977 and supplemented its 1973 decree to prevent a relapse into lassitude or recalcitrance. *See Adams v. Califano*, 430 F.Supp. 118 (D.D.C.1977). The district judge in 1981, however, refused to enjoin federal officials (now in the Department of Education, successor to HEW's responsibilities in this area) from settling a Title VI enforcement proceeding brought against the North Carolina higher education system. In affirming the district court's denial of the *Adams* plaintiffs' request for injunctive relief, we cautioned that neither the district court nor this court has any warrant "to supervise or dictate the details of the Department's enforcement program, once that program culminated in an administrative proceeding, itself subject to judicial review, against a recipient state." *Adams v. Bell*, 711 F.2d 161, 165 (D.C.Cir.1983) (en banc), *cert. denied*, 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 678 (1984); *see also id.* at 165 n. 27, 166–67 (district court may concern itself with the responsibility of federal officials to initiate enforcement proceedings, but not with the subsequent conduct of such proceedings).

While recognizing that enforcement proceedings, once initiated, fell outside his bailiwick, the district judge did not relax his surveillance of the enforcement-initiating process. He continued to entertain the *Adams* plaintiffs' charges of federal agency inertia in the face of inadequate state plans for desegregating higher education facilities and programs. In a March 24, 1983 order, the district court directed tight-

---

1. The 1977 consent order covered three actions then pending in the district court: Adams v. Califano, No. 3095–70 (brought by representatives of racial minorities in 17 southern and border states; representatives of national origin minorities, women, and handicapped persons intervened); *Women's Equity Action League v. Califano*, No. 74–1720 (brought by representatives of women); *Brown v. Califano*, No. 75–1068 (brought by representatives of racial minorities in the 33 other states).

ened federal agency oversight of state plans. Again as a check on the agency's performance, the court required periodic reports to counsel for the *Adams* plaintiffs regarding those plans and their implementation. In June 1983, the parties stipulated to the dismissal of the appeal defendants had noticed from that higher education order.

As to the 1977 consent decree on time-frames and other specifications for complaint processing and compliance reviews, the district court observed that, for a time, progress was made "as a result of the parties getting together and working out their differences." In 1981, however, plaintiffs again complained of defaults and undue protraction in administrative superintendence of the statutory antidiscrimination prescriptions; for the delay and inaction, plaintiffs sought contempt sanctions. The district judge instructed the parties to attempt to achieve agreement on a revised order. Negotiations ensued but proved unsuccessful. In August 1982, alleging changed circumstances, the federal officers moved to vacate the 1977 consent order. They objected, most urgently, to the individual complaint processing regime. Spending resources as the consent decree ordered, they maintained, was both unnecessary and improper.[2] On March 11, 1983, the district court denied the motion to vacate and simultaneously entered an order repeating, with some alterations, the terms of the 1977 consent decree. The federal officers appealed.

Our disposition of the appeal did not reach the principal matter raised and argued by the parties, *i.e.*, to what extent, if at all, did the 1977 agreement embodied in the consent decree bind an administration that had no hand in shaping the arrangement. Instead, we remanded with instructions to the district court to decide whether plaintiffs possessed standing to carry the litigation forward. *Women's Equity Action League v. Bell*, 743 F.2d 42 (D.C.Cir. 1984). We raised that threshold issue on

our own motion in view of an intervening Supreme Court decision, *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). In *Allen*, the Court held that parents of black children who attended public schools in districts in the process of desegregation lacked standing to challenge the adequacy of Internal Revenue Service guidelines disallowing tax benefits to private schools that discriminate on the basis of race. On remand, the district court read *Allen* to mandate dismissal of the litigation in its entirety. *Adams v. Bennett*, 675 F.Supp. 668 (D.D.C.1987). Plaintiffs appealed.

II.

As just set out, in remanding this case, we instructed the district court to consider, particularly, the standing of plaintiffs to maintain this action in light of the Supreme Court's intervening decision in *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). In *Allen*, black parents of children in public schools complained that the Internal Revenue Service (IRS), slighting statutory and constitutional requirements, had not acted with due vigor and dispatch to find and terminate the tax exemptions of private schools that engage in racial discrimination. The *Allen* plaintiffs disclaimed interest in attending the private schools in question and the Supreme Court held that those plaintiffs were not so affected by the challenged IRS policies as to have standing to sue.

■ Critically distinguishing this case from *Allen v. Wright*, plaintiffs here assert that they, or the persons they represent, are enrolled or employed in educational institutions that engage in proscribed discrimination; the federal executive, plaintiffs charge, in contravention of congressional commands, disburses federal funds to such institutions, thereby assisting in the perpetuation of the discrimination plaintiffs encounter. Plaintiffs in this ac-

---

2. The federal officers featured, *inter alia*, the Supreme Court's decision in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), which established that, under Title IX, a private action to check discrimination could be brought directly against the federally-funded institution.

tion thus claim a direct stake in the effective enforcement of the antidiscrimination laws they invoke, not a "mere interest" in the problem. *See Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979) (residents alleging deprivation of integrated community by racial steering have standing); *cf. Capital Legal Found. v. Commodity Credit Corp.,* 711 F.2d 253 (D.C. Cir.1983) (organization's vigorous interest in agency's action held insufficient to establish standing).

The plaintiffs in *Allen* alleged harm occasioned by "the mere fact of Government financial aid to discriminatory private schools," 468 U.S. at 752, 104 S.Ct. at 3325; they simultaneously maintained, however, that they did not seek to enroll their children in such schools. *Id.* at 746, 104 S.Ct. at 3321. The fact that the *Allen* plaintiffs neither attended nor sought to attend the private schools in question proved fatal to their claim of stigmatic injury. The Supreme Court stated:

> [Plaintiffs lack] standing to litigate their claims based on the stigmatizing injury often caused by racial discrimination. There can be no doubt that this sort of noneconomic injury is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing.... Our cases make clear, however, that such injury accords a basis for standing only to "those persons who are personally denied equal treatment" by the challenged discriminatory conduct.

*Id.* at 755, 104 S.Ct. at 3326 (citing *Heckler v. Mathews,* 465 U.S. 728, 739–40, 104 S.Ct. 1387, 1395–96, 79 L.Ed.2d 646 (1984)). Were standing extended to persons not themselves subject to the challenged discrimination, the Court continued, "[a] black person in Hawaii could challenge the grant of a tax exemption to a racially discriminatory school in Maine," and the federal courts would become vehicles " 'for the vindication of the value interests of concerned

bystanders.' " *Id.* 468 U.S. at 756, 104 S.Ct. at 3327 (quoting *United States v. SCRAP,* 412 U.S. 669, 687, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973)).

The direct injury absent in *Allen* [3] is alleged and emphasized by the plaintiffs before us. They assert no "abstract denigration injury." *Allen,* 468 U.S. at 762, 104 S.Ct. at 3330. Fitting their claims into a familiar mold, these plaintiffs, "like the plaintiffs having standing in virtually any equal protection case," *id.,* allege that they are "personally subject to the challenged discrimination." *Id.* at 755, 104 S.Ct. at 3326. The *Allen* Court, in sum, excluded the bystander, but preserved court access for persons claiming direct exposure to government-aided facilities that engage in proscribed discrimination. *See id.* at 762, 104 S.Ct. at 3330. (citing, as still vital precedent, *Gilmore v. City of Montgomery,* 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974)).

The district court recognized that the plaintiffs here asserted "not an abstract or generalized grievance," but a right, currently denied them, to be educated "in an environment ... free from discrimination." *Adams v. Bennett,* 675 F.Supp. at 676. Accordingly, the district judge found "no difficulty in holding that plaintiffs have alleged an injury which is judicially cognizable." *Id.* He concluded, however, that federal aid did not cause the discrimination; and he considered it "entirely speculative" whether threatening to terminate federal aid (or even cutting off aid) to institutions continuing discrimination would redress plaintiffs' injury. *Id.* at 677, 678.

We have heretofore determined, however, that federal funding of facilities that engage in proscribed discrimination is in part causative of the perpetuation of such discrimination, and that "initiating federal fund termination proceedings [is] highly effective in gaining compliance with federal antidiscrimination laws." *Committee for*

---

3. The *Allen* plaintiffs additionally ran up against the well-established position that, ordinarily, one may not litigate the tax liability of another. *See Allen,* 468 U.S. at 748–49, 104 S.Ct. at 3323– 24; *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 46, 96 S.Ct. 1917, 1928, 48 L.Ed.2d 450 (1976) (Stewart, J., concurring).

*Full Employment v. Blumenthal,* 606 F.2d 1062, 1066 (D.C.Cir.1979); *see also National Black Police Ass'n v. Velde,* 712 F.2d 569, 575 & n. 32 (D.C.Cir.1983), *cert. denied,* 466 U.S. 963, 104 S.Ct. 2180, 80 L.Ed.2d 562 (1984); *Adams v. Richardson,* 480 F.2d at 1163 n. 4. Furthermore, due respect for the legislative branch requires us to recognize that vigorous enforcement of laws Congress designed for plaintiffs' benefit has the potential to redress in meaningful measure plaintiffs' injury. *See, e.g., International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 811–12 (D.C.Cir.1983) ("[A]s Congress passed the [Fair Labor Standards] Act partly to provide redress to employers from unfair competition, the suggestion that effective enforcement of the Act will not have this effect directly contravenes the congressional judgment underlying the Act."), *cert. denied,* 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984).

To establish standing, precedent confirms, a plaintiff need not show sure gain should he win in court; an enhanced probability of gain suffices. *See, e.g., Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 280–81 n. 14, 98 S.Ct. 2733, 2742–44 n. 14, 57 L.Ed.2d 750 (1978) (Powell, J.) (impaired opportunity to compete was relevant injury; causation requirements met as to that injury); *National Wildlife Fed'n v. Hodel,* 839 F.2d 694, 705 (D.C.Cir.1988) ("A mere likelihood [of effectiveness of judicial relief] will do.").[4] It bears repetition as well that a ruling for plaintiffs on standing "in no way depends on the merits" of their claims. *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

Ultimately, the district court ruled, even if other standing obstacles were cleared, its orders would nonetheless "intrude on the functions of the Executive branch and violate the doctrine of separation of powers,

which is the basic core of standing." *Adams v. Bennett,* 675 F.Supp. at 680. In so ruling, the district court obscured under a "standing" headline issues properly analyzed discretely. *See infra* pp. 886–887.

Plaintiffs in this action, beyond question, are the intended beneficiaries of the statutes under which they sue. *See supra* pp. 881, 882–83. If, as they charge, administrative action is legally inadequate under the legislation they invoke, judicial review would serve to "promote[ ] rather than undermine[ ] the separation of powers, for it helps to prevent the executive branch from ignoring congressional directives." Sunstein, *Reviewing Agency Inaction After Heckler v. Chaney,* 52 U.Chi.L.Rev. 653, 670 (1985). As stated in incisive commentary:

> It would be ironic indeed if article III were interpreted to preclude federal courts from compelling regulatory agencies to adhere to the will of Congress by undertaking enforcement action to the degree or of the nature that statutes require.

Sunstein, *Standing and the Privatization of Public Law,* 88 Colum.L.Rev. 1432, 1480 (1988); *see also id.* at 1471–72. Standing doctrine homes in on the question of appropriate plaintiffs, *i.e., who* may sue. In our view, the matter of just what Congress willed and what it left to executive discretion in this case presents a question of substantive law rather than an issue of standing.

### III.

For the reasons just stated, we are satisfied that *Allen v. Wright* does not rule out standing for the plaintiffs in this litigation. We are also persuaded, in light of the prior history of the litigation, that a remand at this juncture is not in order. Several fundamental questions remain. They appear

4. Other cases in which standing was upheld in the face of objections that the causation component was too attenuated or the likelihood of redress, too speculative, include: *Heckler v. Mathews,* 465 U.S. 728, 737–40, 104 S.Ct. 1387, 1394–96, 79 L.Ed.2d 646 (1984); *Larson v. Valente,* 456 U.S. 228, 239–43, 102 S.Ct. 1673, 1680–82, 72 L.Ed.2d 33 (1982); *Duke Power Co. v.*

*Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 261–64, 97 S.Ct. 555, 561–63, 50 L.Ed.2d 450 (1977); *United States v. SCRAP,* 412 U.S. 669, 687–90, 93 S.Ct. 2405, 2415–17, 37 L.Ed.2d 254 (1973).

to implicate no issues of unresolved fact. We direct that they be scheduled for briefing and routine assignment to a panel for argument in the court's 1989–90 term. In this manner, the viability of the case can be fully aired and decided without undue protraction.

At the time of our 1984 decision remanding for district court consideration of *Allen v. Wright,* we left several matters unaddressed. The government officers, in their appeal from the district court's March 11, 1983 orders, had emphasized that recent Supreme Court decisions notably limit judicial supervision of agency law enforcement processes at the behest of statutory beneficiaries. For commentary, see, *e.g.,* Sunstein, *Reviewing Agency Inaction After* Heckler v. Chaney, 52 U.Chi.L.Rev. at 661 (calling the basic pattern "unmistakable"). We no longer defer the issues raised or suggested in the prior appeal.

To determine whether plaintiffs may proceed further in the district court, this court acknowledges the propriety of taking up, in view of current Supreme Court instruction, these previously tendered issues: [5]

(1) Do the statutes plaintiffs invoke authorize an action directly against the federal funding/compliance-monitoring agency? *See Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *cf. Council of and for the Blind of Delaware County Valley, Inc. v. Regan,* 709 F.2d 1521, 1531 n. 69 (D.C.Cir.1983) (en banc).

(2) Does the district court have authority to impose procedural or enforcement requirements (timeframes, compliance monitoring, and reporting) supplementing those set out in the governing legislation? *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 544–46, 98 S.Ct. 1197, 1211–13, 55 L.Ed.2d 460 (1978); *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

(3) Are current government officer defendants bound by provisions set out in a consent decree negotiated and agreed upon by prior administrations? If they are, what must they show if they wish to be released from, or obtain modification of, those provisions? *Cf. Citizens for a Better Environment v. Gorsuch,* 718 F.2d 1117 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984). *See generally Consent Decrees: Practical Problems and Legal Dilemmas,* 1987 U.Chi.Legal F. 1.

In addition, as to the *Adams* litigation, and the Order in No. 3095–70 filed March 24, 1983, pressed by counsel at the April 11, 1989 argument: Are the states whose plans, reports, and compliance plaintiffs seek to review persons properly "regarded as indispensable" within the meaning of Fed.R.Civ.P. 19(b)? *Cf. Adams v. Bell,* 711 F.2d 161, 171 (D.C.Cir.1983) (en banc); *see also Martin v. Wilks,* —— U.S. ——, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989).

The expansion of this case since its 1970 commencement to accommodate new parties, pleading new statutes and claims based thereon, has occasioned duplicative, overlapping, sometimes conflicting or confounding briefing. Our Handbook cautions:

Parties with common interests in consolidated or joint appeals must join in a single brief, where feasible. The Court has admonished counsel ... that it looks with extreme disfavor on the filing of duplicative briefs in consolidated cases. As an alternative, a party may adopt or incorporate by reference all or any part of the brief of another.

D.C.Cir. Handbook of Practice and Internal Procedures 44–45 (1987). To assist the court in the further proceedings we hereby direct, the parties shall meet with Chief Staff Counsel to settle on a briefing schedule that closely guards against undue repetitive briefing.

### Conclusion

For the reasons stated, we hold that plaintiffs have standing to sue, and we

---

**5.** Fresh and full briefing is in order because standing was the focus of the parties' presentations to this panel and because the law in point is still evolving and variously interpreted.

direct that remaining issues be briefed and argued in this court.

*It is so ordered.*