The **FREEDOM REPUBLICANS, INC.**, et al.

v.

**FEDERAL ELECTION COMMISSION,** Appellant.

No. 92–5214.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 10, 1993.

Decided Jan. 18, 1994.

As Amended Jan. 21, 1994.

Richard B. Bader, Associate Gen. Counsel, Federal Election Com'n, Washington, DC, argued the cause for appellant. With him on the briefs were Lawrence M. Noble, Gen. Counsel and Vivien Clair, Atty., Federal Election Com'n.

Frederic R. Kellogg, Washington, DC, argued the cause for appellees. With him on the brief was George M. Chuzi.

Mark D. Hopson, Peter D. Keisler and Michael A. Hess, Washington, DC, were on the brief for amicus curiae Republican Nat. Committee.

Before: WALD, BUCKLEY and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The Freedom Republicans, Inc., "a black-led, multiracial, independent organization of Republicans," *see* Freedom Republicans, To-WARD A PARTY OF EQUAL OPPORTUNITY (1991), *reprinted in* Joint Appendix ("J.A.") at 30, filed a complaint in district court against the Federal Election Commission ("FEC" or "Commission") to enjoin the Commission's funding of the Republican National Convention under the Presidential Election Campaign Fund Act of 1974, 26 U.S.C. §§ 9001–9013. Freedom Republicans alleged that the Republican Party's delegate-selection processes and system of minority "auxiliaries" combine to discriminate against minority groups, and that the FEC's continued funding of party activities therefore violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. The district court granted partial summary judgment for Freedom Republicans, ordering the FEC to "promulgate regulations under Title VI of the Civil Rights Act of 1964 governing the selection of delegates to the publicly-funded national party nominating conventions." *Freedom Republicans,*

*Inc. v. Federal Election Commission,* 788 F.Supp. 600 (D.D.C.1992) (as amended May 4, 1992). The FEC appealed. Because we conclude that Freedom Republicans lacked standing to advance its claims below, we vacate that order and remand with instructions to dismiss Freedom Republicans' complaint.

## I. BACKGROUND

Since 1916, the Republican Party has employed variations of a "bonus delegate" system for allocating the number of delegates each state sends to the national nominating convention. Under the current bonus system, each state receives a base number of delegates equal to three times its electoral college vote. *See* J.A. at 56. Then, regardless of population, states electing Republican presidents, senators, or governors or sending a predominantly Republican delegation to the House of Representatives receive bonus delegates. *See id.*[1] As a result of this system, traditional Republican stronghold states that are more likely to support Republicans in the general election are given a greater say in the nomination of the President than are states that consistently fall in the Democratic camp. *See* Brief of *Amicus Curiae* Republican National Committee at 10; Freedom Republicans, TOWARD A PARTY OF EQUAL OPPORTUNITY (1991), *reprinted in* J.A. 29–92, at 55.

Freedom Republicans, Inc. is a nonprofit organization founded in 1979 for the purpose of "maintaining the historic commitment of the Republican Party to the advancement of Americans of African descent, and ... developing a genuinely representative organization for the Party without regard to race,

---

1. The Republican bonus delegate scheme, as set forth in its 1980 National Convention Rules, provides as follows:

From each State casting its electoral vote, or a majority thereof for the Republican nominee for President in the last preceding election: Four and one-half (4½) delegates at large plus the number of the delegates at large equal to 60% of the electoral vote from each such State. In addition, one delegate at large shall be awarded to a State for any and each of the following public officials elected by such State in the year of the last preceding presidential election or at any subsequent election held prior to January 1, 1980:

(a) A Republican United States Senator....
(b) A Republican Governor....
(c) A Republican membership of at least half of the State's delegation to the United States House of Representatives....

THOMAS M. DURBIN & MICHAEL V. SEITZINGER, NOMINATION AND ELECTION OF THE PRESIDENT AND VICE PRESIDENT OF THE UNITED STATES 162 (U.S. Govt. Printing Office 1980).

The parties have neither supplied us with a later version of the rule nor suggested that there have been substantive changes to it in the interim.

color, or national origin...." *See* Admin. Complaint, Dec. 12, 1991, *reprinted in* J.A. at 22. In connection with this mission, Freedom Republicans has approached the Republican National Committee on several occasions with proposals to change the "bonus delegate" system to a system based strictly on the electoral college. *See, e.g., id.* at 22; Freedom Republicans, TOWARD A PARTY OF EQUAL OPPORTUNITY (1991), *reprinted in* J.A. 29–92, at 36. Freedom Republicans contends that the "bonus delegate" system results in decreased representation for the states in which minority groups are disproportionately settled, and that the provision of nonvoting minority "auxiliaries" at the convention provides cold comfort, stigmatizing the groups involved. *See* J.A. at 38, 52. Although the Republican National Committee responded to Freedom Republicans' 1984 presentation by creating a subcommittee to assess the impact of the delegate-allocation mechanism on minority participation, the subcommittee ultimately rejected the proposed electoral college formula in its June 1986 Final Report. *See* J.A. at 23; Brief of *Amicus Curiae* Republican National Committee at 11. The Republican National Committee has since rebuffed later initiatives on similar lines by Freedom Republicans. *See, e.g.,* Letter from Michael W. Grebe, Chairman of Standing Committee on Rules of the Republican National Committee, to Freedom Republicans (June 14, 1991), *reprinted in* J.A. at 28.

Frustrated in its effort to achieve change from within, Freedom Republicans pursued other channels. On December 12, 1991, Freedom Republicans sent an administrative complaint to the FEC urging the Commission to terminate funding of the Republican National Convention in view of the party's allegedly discriminatory practices of selecting delegates and maintaining nonvoting minority "auxiliaries." Freedom Republicans staked its claim on § 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which prohibits discrimination on the basis of race, color, or national origin by any programs or activities receiving federal financial assistance. The FEC is charged with administering convention funding under § 9008 of the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001–13.[2] Freedom Republicans contended that the Commission provides federal financial assistance, and that the convention was therefore a "program[ ] or activit[y] receiving federal financial assistance," within the meaning of Title VI. Observing that "[a]t the very least, operation of Title VI would require that the FEC adopt implementing regulations," J.A. at 24, Freedom Republicans requested that the FEC "withdraw, suspend and terminate, and refuse to grant and continue, Federal financial assistance to the Committee on Arrangements for the 1992 Republican National Convention." J.A. at 27.

The FEC dismissed Freedom Republicans' complaint on the grounds that it did "not state any acts which appear to constitute a violation under our jurisdiction." Letter from Lawrence M. Noble, General Counsel, FEC, to Freedom Republicans (Dec. 23, 1991), *reprinted in* J.A. at 93. The FEC apparently premised its decision on the perception that its jurisdiction did not extend beyond consideration of compliance with the federal election laws. The Commission did, however, forward Freedom Republicans' complaint to the U.S. Department of Justice, which took no action.

In January 1992, Freedom Republicans and its President, Lugenia Gordon, brought their cause to the courts, filing a two-count complaint in district court against the FEC. *See* J.A. at 94–106. Count one alleged that the FEC was in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, for failure to adopt implementing regulations and to accept jurisdiction over Freedom Republicans' administrative complaint. Count two averred that the Republican Party, by employing its delegate-selection process and maintaining auxiliaries drawn on racial lines, was in violation of Title VI for providing disparate treatment to blacks and other minorities. Freedom Republicans sought an injunction ordering the FEC to promulgate regulations implementing Title VI, to accept

2. Under the terms of the statute, the FEC accepts applications for convention funding, verifies the statements included in the applications according to its regulations, and certifies the applications to the Secretary of the Treasury for disbursement of funds. *See* 26 U.S.C. § 9008(g).

jurisdiction over its complaint, and to terminate convention funding to the Republican Party until such time as the Party complied with the anti-discrimination imperative of Title VI.

On February 18, 1992, Freedom Republicans moved for partial summary judgment on count one of its complaint, asking the court to remand to the Commission for rulemaking under Title VI. The court granted this motion on April 7, 1992, directing the FEC to "begin rulemaking proceedings designed to consider the means through which the FEC will ensure compliance with Title VI" and dismissing the case from its docket. J.A. at 19. On April 17, 1992, the FEC filed a motion to amend the district court's judgment, seeking clarification of "whether the Commission is directed specifically to promulgate Title VI regulations governing political parties' selection of delegates to their convention." Memorandum in Support of Motion to Alter or Amend, Apr. 17, 1992, at 1. The district court granted this motion on May 4, 1992, ordering the FEC specifically to "promulgate regulations under Title VI of the Civil Rights Act of 1964 governing the selection of delegates to the publicly-funded national party nominating conventions." J.A. at 20. The FEC filed a timely appeal with this court.

## II. ANALYSIS

■ Compliance with the mandates of Article III is an essential prerequisite to the exercise of federal jurisdiction. We need not venture beyond the threshold question of standing in order to decide this case. As an organization, Freedom Republicans has standing to bring suit in its members' stead only if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *see also Competitive Enterprise Inst. v. NHTSA*, 901 F.2d 107, 111 (D.C.Cir.1990).

We find Freedom Republicans to be deficient on the first score.

■ To satisfy *Hunt*, the members of Freedom Republicans must independently meet the requirements of Article III. The formula for Article III standing has been much rehearsed. At bottom, standing requires (a) concrete injury to a legally-protected interest; (b) a causal connection between the asserted injury and the challenged conduct, such that the injury is fairly traceable to the challenged conduct and not the result of independent action by a third party not before the court; and (c) likelihood that the injury will be redressed by a favorable decision on the merits. *See, e.g., Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (*"Defenders of Wildlife"*); *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Branton v. FCC*, 993 F.2d 906, 908 (D.C.Cir.1993); *Fulani v. Brady*, 935 F.2d 1324, 1326 (D.C.Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992). Because we find that the claims advanced below fail to comport with the causation and redressability requirements, we conclude that the individual Freedom Republicans, and hence, the organization itself, lack standing.

We note at the outset that, although the district court ordered the FEC to promulgate regulations rather than to terminate funding, the "procedural" aspect of the order is not dispositive for purposes of our standing analysis. The district court held in effect that Title VI required the FEC to provide an administrative mechanism through which Freedom Republicans could pursue its complaint. Our justiciability inquiry, however, must focus on Freedom Republicans' standing to bring its core substantive challenge to the FEC's failure to enforce Title VI vis-a-vis the Republican Party. The Supreme Court has instructed that we may not entertain suits alleging generalized grievances that agencies have failed to adhere to the law, but must instead focus on concrete and particularized injuries. *See, e.g., Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2143 (1992); *Ex parte Levitt*, 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937); *Frothingham v.*

*Mellon,* 262 U.S. 447, 488–89, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923). In order to make out constitutionally cognizable injury, plaintiffs must demonstrate that the allegedly deficient procedures implicate distinct substantive interests as to which Article III standing requirements are independently satisfied. *See Defenders of Wildlife,* —— U.S. at —— & n. 7, 112 S.Ct. at 2142 & n. 7; *Capital Legal Found. v. Commodity Credit Corp.,* 711 F.2d 253, 258 (D.C.Cir.1983). To this task we now turn.

### A. *The Injury-in-Fact Requirement*

Because we hold that Freedom Republicans is unable to satisfy the redressability and causation requirements of standing, we need not decide whether it makes out a judicially cognizable injury. Nonetheless, adequate examination of the causation and redressability questions requires that we at least identify the components of Freedom Republicans' alleged harm. Freedom Republicans contends that the current delegate-allocation scheme employed by the Republican Party dilutes its members' voting power at the Republican National Convention. *Cf. Ripon Soc'y v. National Republican Party,* 525 F.2d 567, 572 (D.C.Cir.1975) (en banc), *cert. denied,* 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976). In *Ripon Society,* citizens of individual states that did not reap victory bonuses challenged the Republican Party's delegate-allocation scheme on the grounds that their states were insufficiently represented at the national convention. Drawing an analogy to the interest in representation in a state or national legislature, this court found the diminution in plaintiffs' voting power to be a sufficient injury to confer standing. Although we do not decide the issue of injury in the instant case, we note that this case presents an alleged injury that is a step removed from *Ripon Society.* Here, a group representing minority members of the party challenges the same delegate-allocation scheme on the grounds that, given numerical disparities in minority populations across the nation, inadequate representation of certain states translates into inadequate representation of minority Republicans.

We view the auxiliaries claim as a facet of the basic discriminatory allocation charge, rather than as a distinct injury unto itself. The provision of racially-drawn, nonvoting auxiliaries, according to Freedom Republicans, fails to cure any injury that may stem from the underrepresentation of these minority groups in the ranks of delegates; the auxiliaries are part and parcel of the principal discrimination charge. *See* Freedom Republicans, TOWARD A PARTY OF EQUAL OPPORTUNITY (1991), *reprinted in* J.A. 29–92, at 35–36.

### B. *Causation/Redressability*

In contrast to the plaintiffs in *Ripon Society,* Freedom Republicans brought suit not against the Republican Party, which is the direct source of its alleged injury, but against the FEC. When plaintiffs' asserted injury stems from "the government's allegedly unlawful regulation (or lack of regulation) of *someone else," Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2137 (1992) (emphasis in original), the "fairly traceable" and redressability prongs of standing analysis require more exacting scrutiny. "[W]hile not necessarily fatal to standing," the indirectness of injury " 'may make it substantially more difficult to meet the minimum requirements of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm.' " *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 44–45, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976) (quoting *Warth v. Seldin,* 422 U.S. 490, 505, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975)).

Because this court has ruled previously on the issues of causation and redressability in the Title VI context, *see Women's Equity Action League v. Cavazos,* 879 F.2d 880, 885 (D.C.Cir.1989) (*"WEAL I"*), we face as an initial matter the question whether the remaining two prongs of our standing inquiry have already been resolved in Freedom Republicans' favor. We conclude that they have not. In *WEAL I,* which presented a challenge to federal funding of racially segregated public schools, we stated that

We have heretofore determined ... that federal funding of facilities that engage in proscribed discrimination is in part causative of the perpetuation of such discrimination, and that "initiating federal fund termination proceedings [is] highly effective in gaining compliance with federal antidiscrimination laws." ... Furthermore, due respect for the legislative branch requires us to recognize that vigorous enforcement of laws Congress designed for plaintiffs' benefit has the potential to redress in meaningful measure plaintiffs' injury.

*Id.* at 885–86 (quoting *Committee for Full Employment v. Blumenthal,* 606 F.2d 1062, 1066 (D.C.Cir.1979); other citations omitted). Although couched in general terms, *WEAL I* did reference precedents suggesting that funding termination proceedings had been effective in the past in eradicating school segregation—and thus in redressing plaintiffs' specific injuries. *See, e.g., National Black Police Ass'n, Inc. v. Velde,* 712 F.2d 569, 575 n. 32 (D.C.Cir.1983), *cert. denied,* 466 U.S. 963, 104 S.Ct. 2180, 80 L.Ed.2d 562 (1984); *Adams v. Richardson,* 480 F.2d 1159, 1163 n. 4 (D.C.Cir.1973). *WEAL I* bolstered its reasoning with the notion that due deference to congressional judgments required a finding of redressability.

■ Despite its broad language, we do not believe that *WEAL I* obviates our duty to scrutinize closely the relationship between convention funding and the alleged discrimination at issue in this case. As an initial matter, we note that the legislative deference rationale, relied on as partial, though not exclusive, support for the redressability holding, has been undercut substantially by *Defenders of Wildlife,* — U.S. ——, ——, 112 S.Ct. 2130, 2145 (1992). In *Defenders of Wildlife,* the Supreme Court determined in the course of its discussion of procedural injuries that Article III bound Congress as well as the courts, and implied that congressional findings with respect to causation and redressability to which we might have given deference in the past must now themselves independently satisfy Article III. Because of the express separation-of-powers concerns that animated the Court's justiciability inquiry in that case, *see id.,* it now seems clear that ordinary deference to legislative factfinding does not translate into deference to congressional constructions of the demands of Article III.

Apart from deference, however, we believe that *Defenders of Wildlife* calls into question the *WEAL I* holding with respect to *causation.* Although the *WEAL I* court referenced cases containing statistical evidence on the effectiveness of termination proceedings, the court cited no similar precedent or independent evidence to support its conclusion as to causation, *i.e.,* the link between the inception or continuation of the alleged discrimination and federal funding. *See WEAL I,* 879 F.2d at 885–86. At the very least, *Defenders of Wildlife* stands for the proposition that it is "the burden of the plaintiff to adduce facts showing that [the unfettered choices made by independent actors] have been or will be made in such manner as to produce causation and permit redressability of injury." — U.S. at ——, 112 S.Ct. at 2137. Because *WEAL I* cited no factual basis for causation, it appears not to have satisfied the more exacting scrutiny subsequently required by *Defenders of Wildlife.*

■ Moreover, *Defenders of Wildlife* makes clear that, even if the *WEAL I* redressability standard as applied to the facts of that case were justifiable, the opinion's precedential effect in other factual contexts is considerably more narrow than a broad reading of its language might suggest. *Defenders of Wildlife* stresses the importance of immediate factual context in establishing causation and redressability, to the exclusion of broader, statutory technique-oriented rationales. As the Supreme Court made emphatically clear in *Defenders of Wildlife,* "[t]he party invoking federal jurisdiction bears the burden of establishing" the elements of standing. — U.S. at ——, 112 S.Ct. at 2136. A blanket presumption that in Title VI suits, a plaintiff need not demonstrate particularized causation or redressability would severely undercut the separation-of-powers concerns underlying Article III. Accordingly, we view the *WEAL I* redressability holding as circumscribed by the *WEAL I* facts, rather than as a conclusive presump-

tion of standing for Title VI plaintiffs. We note in this regard that the cases cited by *WEAL I* in support of redressability provided formidable evidence of the successful impact of funding termination proceedings initiated by the Department of Health, Education and Welfare against racially segregated schools—*precisely the issue* in *WEAL I.*

Our task then remains to ascertain whether Freedom Republicans has satisfied its burden of demonstrating both a causal connection between the FEC and its asserted injury and the likelihood of redress by judicial means. We conclude that it has not. We find neither sufficient causal nexus between the actions of the FEC authorizing convention funding and the delegate-selection practices of the Republican Party nor adequate likelihood, as opposed to speculation, that the Party would choose to change its time-tested delegate-selection mechanism rather than forego the convention funding.

When plaintiffs' claim hinges on the failure of government to prevent another party's injurious behavior, the "fairly traceable" and redressability inquiries appear to merge. *See Competitive Enterprise Inst. v. NHTSA,* 901 F.2d 107, 113 (D.C.Cir.1990). In such cases, both prongs of standing analysis can be said to focus on principles of causation: fair traceability turns on the causal nexus between the agency action and the asserted injury, while redressability centers on the causal connection between the asserted injury and judicial relief. *See Allen v. Wright,* 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984). Despite these similarities, however, each *inquiry has its* own emphasis. Causation remains inherently historical; redressability quintessentially predictive. *See id.*

Upon careful review, we conclude that Freedom Republicans has not adduced sufficient evidence to demonstrate the requisite causal connection between the FEC and its

asserted injury. By all accounts, the delegate-selection scheme currently employed by the Republican Party has been in place since early in this century. *See, e.g.,* Brief for Appellant at 14; Freedom Republicans, Toward a Party of Equal Opportunity (1991), *reprinted in* J.A. 29–92, at 51. The system of bonus delegates was introduced in the aftermath of the convention of 1912, which was characterized as "the most tumultuous ever." Congressional Quarterly's Guide to U.S. Elections 64 (1975). During the 1912 convention, the Party adhered to its traditional policy of allocating delegates on the basis of a state's electoral college votes. Southern states, which possessed convention voting strength that exceeded their propensity to elect Republicans, successfully boosted President William Howard Taft to the nomination over former President Theodore Roosevelt. Roosevelt bolted to the Progressive Party in protest, garnering 27.39% of the popular vote in the general election (88 electoral votes) in comparison with Taft's 23.18% (8 electoral votes). *Id.* at 245, 284. The chief beneficiary of the internecine strife, and the victor in the general election with a southern sweep and 435 electoral votes, was the Democratic candidate, Woodrow Wilson. *See id.* Shortly after this stunning defeat, the Republican Party reformed its delegate-allocation scheme. *See id.* at 68. Under the new formula, which considered a state's Republican voting strength in addition to its electoral vote, the southern states lost over a third of their delegates. *See id.*[3]

The FEC's role in the funding of presidential nominating conventions began in 1974 with the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001–9013. The Republican Party's practice of allocating delegates in accordance with Republican voting strength thus preceded public convention funding by fifty-eight years. Moreover, historical data strongly suggest the Party's par-

---

3. We note that the Republican Party is not alone in according voting preferences to states that elect the party's candidates. The Democratic Party first adopted rules to take account of states' Democratic voting strength in determining the convention vote allocation in 1944. *See* Congressional Quarterly's Guide to U.S. Elections 83 (1975). The Democratic Party offers four alter-

native formulas for state delegate allocation, each of which takes into account the strength of the state democratic vote by measuring votes in the most recent presidential or gubernatorial elections. *See* Thomas M. Durbin & Michael V. Seitzinger, Nomination and Election of the President and the Vice President of the United States 147–48 (U.S. Govt. Printing Office 1980).

ticularized and nonmonetary motives in developing the bonus delegate system. In the aftermath of devastating defeat in the 1912 elections, the Republican Party pursued reforms that remedied a specific problem, the overrepresentation of states whose preferences did not translate into popular votes. This is basically the same rationale for preserving the delegate-selection scheme that has been proffered by the Party ever since,[4] *see* Brief of *Amicus Curiae* Republican National Committee at 7,[5] and plaintiff has adduced no evidence to suggest the contrary. In light of this, it would take a leap of logic to find causation for the bonus delegate system in public funding. As in *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 42–43, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976), the injury alleged in Freedom Republicans' complaint is not fairly traceable to any encouragement on the part of the government, but appears instead to be the result of decisions made by the Party without regard to funding implications. *See also Allen v. Wright*, 468 U.S. 737, 759, 104 S.Ct. 3315, 3328, 82 L.Ed.2d 556 (1984) ("The links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak for the chain as a whole to sustain respondents' standing.").

Nor can we confidently predict any causal connection between a possible judicial response and the redress of appellee's injury. For fifty-eight years, the Republican Party maintained a bonus delegate scheme when the Party itself was responsible for drumming up the funds necessary to provide a convention. In the absence of any evidence that the perpetuation of the scheme is founded on other than pragmatic political considerations, we would be venturing into the realm of pure speculation were we to attempt to foretell the Party's response to termination of its present funding. Although current levels of public funding are substantial,[6] and the Republican Party would inevitably face a problem if its funding, but not that of the Democrats, were to be withdrawn,[7] we cannot begin to predict on this record what impact withdrawal might have on Party decisionmaking as to so vital a political decision as delegate-allocation. We must conclude, under the instruction of *Defenders of Wildlife*, that Freedom Republicans has not borne its burden of adducing evidence to demonstrate that it is " 'likely,' as opposed to merely 'speculative,' that [its] injury will be 'redressed by a favorable decision.' " —— U.S. ——, ——, 112 S.Ct. 2130, 2136 (1992) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)).

## III. CONCLUSION

We hold that Freedom Republicans did not meet the causation and redressability requirements necessary for standing under Article III of the Constitution. So far as the record before us shows, the current delegate-

---

**4.** One commentator has, however, depicted continued conflict over the delegate-allocation scheme as a battle between the conservative Republicans predominating in western and sunbelt states and the more moderate Republicans populating urban states. *See* Ronald Brownstein, *Conservatives' Victory on Republican Party's Delegates Rules May Give Them the 1988 Presidential Nomination*, NAT. J., Sept. 1, 1984, at 1610.

**5.** Freedom Republicans moved to strike portions of the Brief of *Amicus Curiae*, the Republican National Committee, containing background material on the history of the delegate selection rule at issue. We rely on the Brief only for its assertion of the Party's motivation for the delegate-allocation scheme, and so deny this motion. *See Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors*, 647 F.2d 200, 201 (D.C.Cir. 1981).

**6.** Section 9008(b)(1) of the Presidential Election Campaign Fund Act of 1974, 26 U.S.C. §§ 9001–9013, provides that "the national committee of a major party shall be entitled to payments ... with respect to any presidential nominating convention, in amounts which, in the aggregate, shall not exceed $4,000,000." The statute also provides for annual adjustments in this cap based on increases in the price index. *See* 26 U.S.C. § 9008(b)(5) (referencing 2 U.S.C. § 441a(c)(1)). According to Freedom Republicans' complaint, the Committee on Arrangements for the 1992 Republican National Convention received in excess of $10,000,000 in convention funding. *See* J.A. at 98.

**7.** But see note 3, *supra*.

allocation scheme of the Republican Party appears to be the product of complex political considerations that emerged and are sustained independently of any concern for funding. Nor can we with any confidence predict that action on our or the FEC's part would redress Freedom Republicans' asserted injury. Accordingly, the judgment of the district court is

*Vacated and Remanded.*